

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI EX REL., | ) | |
| ANDREW BAILEY, | ) | |
| | ) | |
| Relator, | ) | WD87305 |
| | ) | |
| V. | ) | OPINION FILED: |
| | ) | OCTOBER 22, 2024 |
| THE HONORABLE | ) | |
| RYAN W. HORSMAN, | ) | |
| CIRCUIT JUDGE, AND | ) | |
| JANE GANN, CIRCUIT CLERK, | ) | |
| | ) | |
| Respondents. | ) | |

## ORIGINAL PROCEEDING IN CERTIORARI

Before Writ Division: Cynthia L. Martin, Presiding Judge, Karen King Mitchell, Judge
and Thomas N. Chapman, Judge

This is an original proceeding in certiorari to review the record in *Hemme v.

McBee*, Circuit Court of Livingston County, Missouri, Case Number 23LV-CC00008,

where the Honorable Ryan W. Horsman ("habeas court") issued a writ of habeas corpus

in favor of Sandra L. Hemme ("Hemme").[1]  The writ of habeas corpus vacated Hemme's June 4, 1985 conviction of capital murder which had been entered in the Circuit Court of Buchanan County, Missouri, in Case Number CR380-35F, following the November 12, 1980 homicide of P.J. ("victim").[2]

After a thorough review, we refuse to quash the habeas record.  Hemme's conviction of capital murder is vacated, and Hemme is ordered discharged subject to retrial as set forth in this Opinion.

## Factual and Procedural History[3]

Victim was murdered in her apartment in St. Joseph, Missouri on November 12, 1980, sometime between 5:00 p.m. and 7:00 p.m.  Victim was stabbed, strangled, and sexually assaulted.  On the day of her murder, victim had worked at the St. Joseph Public Library between 8:00 a.m. and 5:00 p.m.  Victim's last known sighting was at

---

[1]At the time Hemme filed her petition for writ of habeas corpus, she was incarcerated in the custody of the Warden of the Chillicothe Correctional Center in Livingston County, Missouri.  A petition for writ of habeas corpus must be filed "in the first instance . . . to a circuit or associate circuit judge for the county in which the person is held in custody" unless the person has been convicted of a capital crime and sentenced to death.  Rule 91.02(a), (b).

All Rule references are to *Missouri Court Rules, Volume 1--State, 2023* unless otherwise noted.

[2]Throughout this Opinion, we refer to non-party witnesses or crime victims by their initials or by less than their full names, instead of by use of their full names, as required by section 509.520, which became effective August 28, 2023.

[3]A "writ of certiorari 'presents only questions of law on the record brought up by the return and does not permit consideration of issues of fact.'"  *State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 516 (Mo. banc 2001) (quoting *State ex rel. Reorganized Sch. Dist. R-9 v. Windes*, 513 S.W.2d 385, 390 (Mo. 1974)).  We therefore summarize facts as found by the habeas court, and recite procedure as is reflected in the record brought up by the return.

approximately 5:00 p.m. when she was seen by an acquaintance driving alone in her small, two-seater, white sports car in downtown St. Joseph. Victim had reported to co-workers her intention to attend a meeting at 7:00 p.m. on the evening of her murder but never arrived.

When victim did not report to work on November 13, 1980, her employer called victim's mother, who went to victim's home at 1502 Riverside Road, Apartment 1. Victim's apartment was a stand-alone residence, as the apartments where victim lived had been converted from a "cabin-style" motel. Victim's mother discovered victim deceased, nude, and lying in a pool of blood on the bedroom floor. A pillow had been placed over victim's face, and her hands were bound behind her back with a telephone cord. Two lengths of cut television antenna wire were on the floor next to victim's body. Two black hairs were recovered from victim's bedsheet. There were no signs of forced entry into victim's home.

The murder was covered extensively in the local press. A newspaper photographer was allowed inside victim's home to document the crime scene. Publicly disseminated photographs of the crime scene showed victim's floral bedspread, and the pillow that had been over victim's face, as well as a large blood stain on the floor in the bedroom. Victim's address was listed in printed news articles along with a photograph of the exterior of victim's apartment. News articles also showed the location of victim's apartment on the street. News articles published on November 14, 1980, contained details about the crime scene including that victim had been found nude, with a pillow over her head, with her hands tied behind her back with a telephone cord, with pantyhose

3

as a ligature tied around her throat, and with wounds to her head caused by both blunt and sharp objects.

Though no physical evidence of any kind connected Hemme to victim, the murder, or the murder scene, Hemme was questioned about the murder on November 28, 1980, by Detective S.F. with the St. Joseph Police Department ("SJPD"). Detective S.F. was assigned to the crimes-against-persons unit, and was tasked with following up on leads as directed by his superiors. Detective S.F. testified during the habeas hearing that he was not in charge of the investigation into victim's death, that several SJPD officers were working assigned leads in connection with the murder, that it would be uncommon for officers working leads to know all information that was being investigated by other officers, and that the overall control of the investigation was in the hands of the SJPD Chief of Police, R.H. ("Chief R.H.")

When Detective S.F. interviewed Hemme on November 28, 1980, she was receiving in-patient care at St. Joseph State Hospital, a mental health facility, having been involuntarily committed there on November 27, 1980. Detective S.F. was directed by his superiors to interview Hemme in connection with victim's murder because Hemme was found on November 25, 1980, in a nurse's home, with a knife. Hemme had been receiving inpatient treatment at St. Joseph State Hospital in the days before victim's murder and left the hospital against medical advice at about 1:05 p.m. on November 12, 1980, the day of victim's murder.

Detective S.F. observed Hemme to be "not totally cognizant of what was going on," and that she "tended to wander when responding to questions." He found Hemme

4

difficult to follow, to be suffering from memory lapses, and unable to focus. Nursing records reflect that Hemme had been injected with antipsychotic medication and a sedative shortly before she was questioned. During the questioning, Detective S.F. showed Hemme a single photograph of victim. Hemme said she may have gotten high with victim and caught a ride from her in a small brown car the day she left the hospital on November 12, 1980. Hemme also reported that she thought a man may have been in the back seat of the car, but that she was "pretty spacey" and did not "really remember much of anything." When asked where she went with victim, Hemme said she was not sure, but maybe to Dearborn, Missouri. Detective S.F. ended the interview because he felt it was not productive in light of Hemme's condition at the time.

On December 1, 1980, Detective S.F. again interviewed Hemme while she remained involuntarily committed at St. Joseph State Hospital. This time, Hemme said that after she left the hospital on November 12, 1980, she got picked up by a man and a woman driving a "78 or 79 model, very light blue, two[-]door car," and that she was dropped off by them at the Dearborn, Missouri exit. Hemme claimed the man's name was "Joe," and that he was around twenty-eight years of age, white, knock-kneed, double jointed, about 5'8" tall, weighing about 125 pounds, and with a thick, black mustache. Hemme's description very closely resembled a man, Bobby C., who would tell police months later that he had given Hemme a ride to the Dearborn, Missouri exit, approximately 20 miles south of St. Joseph, after picking her up in downtown St. Joseph on the afternoon of November 12, 1980. During the December 1, 1980 interview, Hemme told Detective S.F. that the woman in the car was wearing all blue. Hemme told

5

Detective S.F. that after she was dropped off in Dearborn, she hitchhiked to Concordia, Missouri (where Hemme's parents live), arriving there between 8:30 and 9:30 p.m. Detective S.F.'s notes from the interview indicated that Hemme's statement was "not consistent with other witness statements and reports, *i.e.* times and locations."

On December 2, 1980, Hemme was interviewed by Detective S.F. a third time. She reported leaving the hospital at around 1:00 p.m. on November 12, 1980, and claimed to have been picked up by a man and a woman in downtown St. Joseph. This time, Hemme claimed the woman in the car was the same woman in the photograph that Detective S.F. showed her on November 28, 1980, and claimed the woman was wearing a "light blue suit." Victim would have been at work when Hemme claimed to have been picked up by the man and woman. Victim was reported to have been wearing a black, white, and grey three-piece suit when she left work on November 12, 1980. In this statement, Hemme gave the name "Joe W."[4] as the male driver of the vehicle. Hemme claimed the woman introduced herself as "Pat,"[5] that the three drove to a Skaggs pharmacy, and then drove around more before stopping so the woman could go inside a two-story red brick house. According to this statement, Hemme was then driven by Joe W. to victim's home, where she waited in the car while Joe W. went inside with victim. Joe W. returned to the car, according to Hemme, with blood on his shirt, and told Hemme he had "killed the f***ing bitch." Hemme said she was then driven by Joe W. to an

---

[4]Hemme gave a complete last name for "Joe W." though we are not including the last name here.

[5]"Pat" is the shortened version of victim's first name.

6

overpass off of I-29, asked to perform a sex act, and then dropped off at Dearborn. Once again, Detective S.F.'s notes taken during the interview observed that "[a]s before, . . . Hemme's time reference and locations seemed inconsistent, so additional interviews will be conducted."

On December 3, 1980, the eighth day of Hemme's involuntary commitment at St. Joseph State Hospital, investigators took Hemme from the hospital to victim's apartment where she was questioned a fourth time. Detective S.F. claimed that Hemme directed them to victim's apartment. Hemme was not accompanied by any medical personnel, and was gone from the hospital for nearly six hours. She did not receive her prescribed antipsychotic medications while she was gone. Hemme was shown a photo lineup while sitting in a police car, and identified Joe W. Hemme told investigators she knew about "this incident because of ESP."

Detective S.F. took Hemme inside victim's now empty apartment. Detective S.F. showed Hemme four photographs, which included images of victim's nude body; of victim's hands bound behind her back with a telephone cord; of pantyhose around victim's neck; of the flower print design of victim's bedspread and pillow; and of the two lengths of television antennae wire on the floor above victim's head and by her side. Detective S.F. claimed that Hemme then described how Joe W. committed the murder. Hemme was taken to the police station where she gave a statement that contained a significantly different version of events when compared to her previous statements. This time, Hemme reported that victim was *not* a passenger in Joe W.'s car, and instead that Joe W. was alone in the car when he picked Hemme up and drove Hemme to victim's

7

home. Hemme said she was inside victim's apartment when she witnessed Joe W. sexually assault and stab victim upon her bed before dragging her body to the floor, binding her wrists, and strangling her with pantyhose. Hemme also described details about victim's home. She described a floral print pillow, an 8 x 10 graduation photo on the wall, macramé on the couch, and a mahogany television set that stood on legs. She also described a brown car in victim's driveway, and said that she observed a large white cat walk into the house. No evidence ever confirmed that any of the items Hemme claimed to have seen in victim's apartment were ever there, with the exception of the floral print pillow that had been in the photograph Detective S.F. showed Hemme that same day. Crime scene photographs of the interior of victim's small home, which captured many angles of the home, did not show a graduation picture on the wall, macramé on the couch, or a mahogany television set on legs. Crime scene photographs showed a small television sitting atop a desk in victim's living room. Victim did not have a cat, and instead had a small dog. Victim did not drive a brown car and instead drove a small white, two-seater sports car, with no back seat.

On December 5, 1980, Detective S.F. questioned Hemme again. This time Hemme claimed she cut television antennae wire for Joe W. to use to bind victim's hands. She also described for the first time taking from victim's home a jacket, a blue and white bandana, a Playgirl magazine, and a pair of red gloves, which she claimed to have left at her parent's home in Concordia later that evening. These items had been retrieved by the SJPD from Hemme's parent's home on December 1, 1980, and were catalogued into evidence in victim's murder case on December 9, 1980.

8

On December 5, 1980, Hemme was arrested and charged with concealing an offense. She was removed from St. Joseph State Hospital and placed in detention at the Buchanan County jail. On December 5, 1980, Detective S.F. and other SJPD investigators traveled to Topeka, Kansas to arrest Joe W., who was charged with capital murder. Joe W.'s house was searched. No evidence linking Joe W. to victim's murder was found.

Investigators quickly determined that Joe W. could not have murdered victim. He was locked in a detoxification facility in Topeka, Kansas when victim was killed. The capital murder charges against Joe W. were dismissed on December 10, 1980.

Hemme was questioned again on December 9, 1980. Detective S.F. told her that Joe W. had a confirmed alibi and could not have participated in the crime. Hemme reacted in disbelief and accused Detective S.F. of lying to her. Hemme said she was going crazy. During the December 9, 1980 interview, Hemme repeatedly told investigators that she did not remember the crime, but now claimed that victim picked her up in downtown St. Joseph, Missouri, and took her back to victim's home so that victim could "get cleaned up." Hemme expressed doubt about what happened, saying that "she really didn't know if she killed [victim] or not." Detective S.F. later testified that a written statement could not be taken from Hemme because of her emotional state. Detective S.F. told a sheriff's deputy that Hemme had told him she attempted suicide while being held at the Buchanan County jail. Detective S.F. told his commanding officer that he could no longer question Hemme because he had reached his limit, was no longer effective, and knew he was not "getting the truth."

9

Despite Detective S.F.'s expressed concern, Hemme was questioned again on December 10, 1980. Detective S.F. did not participate in this interview. After speaking with two SJPD detectives and an investigator for an undocumented amount of time, a court reporter was brought in to take a statement from Hemme. The resulting transcribed statement was relied on by the state as the "truth."[6] *Hemme v. State*, 680 S.W.2d 734, 735 (Mo. App. W.D. 1984).

In the statement, Hemme claimed she was picked up by victim in downtown St. Joseph shortly after she left the hospital, and that victim was driving a small brown car. When asked how she knew victim, she claimed it was from the library. Hemme claimed she told victim that she was on her way to Concordia, and that victim said she would give Hemme a lift, only she was going to a class and wanted to go home and take a shower. Hemme claimed she rode with victim to victim's house, and went inside and waited on the couch while victim showered. Hemme claimed she then lost it and confronted victim in the hallway after she got out of the shower, grabbed her by the throat and pushed her into the bedroom where she hit her with "something." Hemme claimed she had a knife with her in a black sheath that was on her belt or in her back pocket and that "I think I stabbed [victim] with it, I don't know." Hemme then claimed she went back into the living room and got the antenna wire from the television, which she then cut to use to tie victim's hands, but it didn't work. Hemme claimed she went to the kitchen and "already

---

[6]We noted in *Hemme v. State*, 680 S.W.2d at 735, that it appeared Hemme was first interrogated on December 5, 1980, based on a scant guilty plea hearing record. The habeas record establishes that Hemme was actually first interrogated on November 28, 1980.

10

had the knife from the kitchen," which she used to cut the phone cord. She claimed that she then rolled victim over and tied her wrists. Hemme was asked to confirm if victim's wrists were eight inches apart, and Hemme said "I think you are right, I don't know." Hemme then said she tied pantyhose around victim's neck and pulled as hard as she could. Hemme then said she threw a pillow over victim's face, and "ran a knife up her a couple of times," referring to the handle. Hemme described victim's purse and reported taking it with her when she left. Hemme once again reported taking a Playgirl magazine, a CPO jacket, a pair of gloves, and a bandana from victim's apartment, and once again reported seeing a white cat come into the apartment while she was leaving. Hemme claimed she walked back to downtown St. Joseph, and that a younger man driving a blue Trans Am drove her to I-29 where she started hitchhiking. She claimed she then got a ride with a guy in a car she could not describe who took her to Dearborn, where she caught another ride in "I think a truck," with an undescribed person who took her to 6th Street near I-70 in downtown Kansas City, where she claimed to have discarded victim's purse. Hemme claimed to have then caught another ride to Concordia, arriving at her parents' home around 10:00 p.m. Hemme claimed to have discarded the knife she used to stab victim in Battlefield Park, in Lexington, Missouri, a couple of days after the murder. She reported that the other items she took from victim's apartment were left at her parents' house. Hemme drew diagrams at the investigators' request to show the location of the discarded purse and knife. The locations were searched, and the purse and knife were not found.

11

Hemme was charged with victim's murder by grand jury indictment on December 23, 1980.

In the meantime, in the days immediately following victim's murder, a number of eyewitnesses had reported seeing a white pickup truck parked near and next to victim's apartment during the time frame between 5:30 p.m. and 7:30 p.m. on November 12, 1980. The white pickup truck lead was significant to the early investigation into victim's murder.

On December 8, 1980, two days before Hemme's December 10, 1980 confession, the SJPD learned that on November 13, 1980, a Black man with a badge had attempted to use victim's credit card to purchase a camera lens at a Kansas City, Kansas camera store. Detective S.F. was not aware of the unknown person's use of victim's credit card on December 9, 1980, when he interviewed Hemme for the last time, before expressing the belief that further interviews with Hemme would not be productive at securing truthful statements.

On December 18, 1980, the SJPD opened up an investigation into M.H. for insurance fraud. At the time, M.H. was a patrol officer for SJPD. M.H. had reported his 1978 Ford pickup truck stolen from the Kansas City airport on July 14, 1980. M.H. received an insurance payout for the truck in the amount of $4,350. But, on December 18, 1980, M.H.'s training partner, Detective D.G., saw M.H. driving the reportedly stolen truck as he was picking up his paycheck. Detective D.G. reported what he had seen, and prepared a written report. M.H.'s "stolen" truck was then located and photographed in the

12

parking lot of the apartment complex where M.H. lived. M.H.'s truck was a white, 1978 Ford F-150 pickup with a brush guard, a roll bar, and a tonneau cover.

M.H. was questioned by the SJPD on December 18, 1980, and admitted he had falsely reported the truck's theft because he needed the money. M.H. was terminated from the SJPD and arrested on suspicion of insurance fraud.

One day later, on December 19, 1980, M.H. was positively identified as the Black male who had attempted to use victim's credit card on November 13, 1980, the day after victim was murdered. By that time, the SJPD had determined that the white truck seen parked outside of victim's apartment on the night victim was killed was the truck that was the subject of M.H.'s insurance fraud investigation.

M.H. was questioned by SJPD about victim's homicide on December 19, 1980. He admitted he had parked his truck near victim's home about 5:30 p.m., but claimed he did so because he was meeting a woman named "Mary" in order to have sex at the Woodlawn Court Motel located adjacent to victim's apartment. M.H. claimed that he left the motel at about 6:30 p.m., and found a purse in a ditch near where he had parked his truck with victim's credit card inside. M.H. claimed he took the purse back to his apartment complex and threw it in the trash dumpster. M.H. refused to give any further details about "Mary," and refused to describe the inside of the motel room where he allegedly met with "Mary" for the purpose of having sex.

On December 19, 1980, M.H.'s apartment was searched for evidence of "burglary and homicide." The SJPD case number assigned to victim's murder was one of several case numbers identified on a consent to search waiver form. The trash dumpster at

13

M.H.'s apartment complex was searched, but victim's purse was not found. Two jewelry boxes were found in M.H.'s apartment. M.H.'s wife told the officers searching the apartment that the jewelry was not hers, and that she had never seen the jewelry before in her life. The officers conducting the search prepared a report about the search. This report noted the address of the search but did not mention M.H.'s name as the occupant of the apartment at the noted address.

On December 22, 1980, Detective S.F. was directed to follow up on the alibi M.H. provided during his December 19, 1980 interview regarding the use of victim's credit card. Before this date, Detective S.F. had not been assigned to do any work to investigate M.H. as a lead in victim's murder. Detective S.F. went to a gas station near victim's apartment, and to the Woodlawn Court Motel to investigate M.H.'s alibi. The motel manager did not recognize M.H.'s photograph in a photo array as someone who had stayed at the motel on November 12, 1980. A list of motel guests given to the SJPD on November 14, 1980, did not show M.H.'s name as a guest on November 12, 1980.

The habeas court found that the December 19, 1980 SJPD report prepared after M.H.'s interview about the attempted use of victim's credit card, and Detective S.F.'s December 22, 1980 report documenting his unsuccessful attempt to verify M.H.'s alibi on the night of victim's murder, were included in the prosecution file made available to Hemme's attorney. The habeas court did not make a finding about whether the December 18, 1980 SJPD report prepared after M.H.'s interview regarding insurance fraud was included in the prosecution file.

14

Later on December 22, 1980, at the request of Chief R.H., victim's parents came to the police station to view jewelry seized during the December 19, 1980 search of M.H.'s apartment. There is no indication that victim's parents knew where the jewelry came from. Detective S.F. documented this interview. Victim's father signed a written statement after the interview confirming that a pair of unique earrings found in the recovered jewelry had been given to victim by him years prior, and that he had seen victim wearing the earrings. Detective S.F. confirmed the details of the interview with victim's father in a report he prepared, and catalogued the earrings as evidence under the case number assigned by SJPD to victim's murder investigation. The physical evidence custody report Detective S.F. prepared noted the earrings had been "received" from M.H. The habeas record establishes that victim's father's December 22, 1980 written statement identifying the earrings, Detective S.F.'s December 22, 1980 report about the interview with victim's father, and Detective S.F.'s December 22, 1980 physical evidence custody report for the earrings, were not included in the prosecution file made available to Hemme's attorney.

By the time of the developments identifying M.H. as a potential suspect in victim's murder, the SJPD had already secured the December 10, 1980 confession from Hemme, and the prosecutor was just days away from securing the December 23, 1980 grand jury indictment of Hemme for capital murder. The habeas record reflects very little effort was undertaken by SJPD to further investigate M.H.'s involvement in victim's murder after victim's father identified victim's earrings on December 22, 1980. M.H. was never cleared as a suspect in victim's murder. Instead, on June 8, 1981, M.H. pled guilty to

15

insurance fraud in connection with the false report that his pickup truck had been stolen. In exchange for his guilty plea, the state agreed to "dismiss all pending charges against [M.H.] with the exception of the offense to which [M.H. was] pleading guilty and otherwise not prosecute [M.H.] for any other criminal matters as to which [M.H. was] now under investigation." By the time of his guilty plea, in addition to his potential connection to victim's murder, M.H. was also being investigated for several burglaries, trespass, and peeping Tom incidents. P.R.[7] was the assistant Buchanan County prosecutor who prosecuted the insurance fraud case against M.H. However, P.R. was not involved in prosecuting Hemme at that time. The habeas record establishes that M.H.'s insurance fraud investigation, his June 8, 1981 plea agreement, and the SJPD records relating to the other criminal activity for which M.H. was contemporaneously under investigation, were not included in the prosecution file in victim's murder case that was made available to Hemme's counsel.

On January 23, 1981, one month after Hemme was indicted for capital murder, Bobby C., (who matched the detailed description of the man Hemme described during her December 1, 1980 interview with Detective S.F.), wrote a letter to Hemme in jail, saying "Dear Sandy, do you remember me? I gave you a ride to the Dearborn exit on 12 Nov. 1980. Would it be possible to see you?" After receiving this letter, Hemme's

---

[7]P.R. now serves as a Circuit Judge.

attorney, D.S.,[8] told Detective S.F. that Hemme told him she did not kill victim, but was present when two men did: Bobby C. and another man, C.W., Jr.

On February 2, 1981, Detective S.F. interviewed Bobby C., who described giving Hemme a ride from St. Joseph to the Dearborn exit on the afternoon of November 12, 1980, after seeing Hemme hitchhiking by J.C. Penney Auto Center on Frederick Avenue in downtown St. Joseph. Bobby C. said he was driving a 1980 two-toned tan-colored Dodge Omni alone at the time, and that Hemme was "obviously under the influence of something." Bobby C. denied playing any role in victim's murder, and denied knowing C.W., Jr. Detective S.F. later testified that he had no reason to doubt Bobby C.'s account that he picked up Hemme alone on the afternoon of November 12, 1980, dropped her off miles away from St. Joseph in Dearborn, and never had any contact with victim. The patent inconsistency between Bobby C.'s statement, which Detective S.F. credited as truthful, and Hemme's December 10, 1980 confession was not further investigated, and was effectively ignored by the SJPD.

In approximately February of 1981, allegations that the SJPD was covering up an FBI Report that implicated someone other than Hemme in victim's murder were reported in local television and print media. The publicized reports noted that a "man" had been caught using victim's credit card the day after the murder. The publicized reports did not identify the man as M.H. or note that the "man" had been an SJPD officer at the time he used victim's credit card. The SJPD responded to the coverup allegations by stating that

_____

[8]Hemme was represented following her indictment and through the time of her guilty plea by D.S., an attorney who is now deceased.

17

the FBI Report in question, which it had just received, did not implicate any other suspect, and in fact cleared all other suspects who had been investigated. An early March 1981 newspaper article addressing the SJPD's response to the coverup allegations was headlined "FBI report reveals no other suspect," and noted that Hemme "is and likely will remain the only person charged" with victim's murder. The newspaper article also noted that Hemme's attorney would be in St. Joseph soon to "get a copy of the FBI written report," and that Hemme's attorney "already had all other information which is in the prosecutor's records concerning the crime and the investigation."

The habeas record establishes that the "FBI Report" that was the subject of the rumored coverup and of the aforesaid newspaper article was dated March 4, 1981. The March 4, 1981 FBI Report identified several persons, including M.H. and victim, but *not* Hemme, for whom identified articles were to undergo chemical analysis, microscopic analysis, and fingerprint analysis. Head and pubic hairs from M.H. were identified as received by the FBI on January 19, 1981, under cover of a letter dated January 10, 1981. Though the SJPD apparently advised the press that the leaked FBI Report revealed no other suspects, in fact the March 4, 1981 FBI Report noted that a black head hair found on victim's bedsheet "exhibits microscopic characteristics similar to the hairs" provided by M.H. as specimens. The Report went on to note that "[t]he possibility that this hair originated from the person represented by [the] specimen [M.H. provided] cannot be eliminated." The Report noted that the racial characteristics of this particular black head hair "are not well defined," but that a second black head hair fragment found on victim's

18

bedsheet was of "Negroid origin." The habeas record establishes that the March 4, 1981 FBI Report was included in the prosecution file made available to Hemme's counsel.

The prosecution file which was made available to Hemme's counsel included only one other FBI Report, dated March 12, 1981. The March 12, 1981 FBI Report noted that hairs recovered from a jacket, a pair of gloves and a bandana were Caucasian hairs, but did not belong to victim. These were three of the four items Hemme claimed to have taken with her from victim's apartment after victim was murdered, and that were retrieved by the SJPD from Hemme's parents' home on December 1, 1980, four days before Hemme first mentioned the items in her December 5, 1980 statement to Detective S.F. No other FBI Reports were included in the prosecution file made available to Hemme's attorney.

At around the time of the alleged SJPD coverup involving the March 4, 1981 FBI Report, Hemme's counsel, D.S., was afforded access to the prosecution file. He would have had access, therefore, to the December 19, 1980 SJPD report about the interview with M.H. involving attempted use of victim's credit card. And he would have had access to the December 22, 1980 report prepared by Detective S.F. after unsuccessfully attempting to confirm M.H.'s alibi for the night of victim's murder. Neither of those reports disclosed that M.H. was an officer with the SJPD. It appears that Hemme learned of M.H.'s potential connection to victim's murder from her attorney.

On April 7, 1981, just three days before Hemme was scheduled to plead guilty to murdering victim, Hemme gave yet another statement at the Buchanan County jail, claiming that she had been picked up on the day of victim's murder by a male driver who

19

later killed victim. Hemme claimed the male driver was M.H. "Joe," who had been mentioned by Hemme in earlier statements, was now reported by Hemme to be a twelve-year-old boy who was accompanying M.H. Hemme told police that after murdering victim, M.H. showed her photos of a second victim in a trash bag and claimed to have killed and buried the woman along a river bank. Hemme could not identify M.H. when shown a photograph of him in a mugshot array.

Hemme entered a guilty plea to the charge of capital murder on April 10, 1981. *Hemme v. State*, 680 S.W.2d at 735. "No witnesses to the crime were reported and the record of the plea hearing includes no description of the evidence the state would have offered at trial, save only the statements obtained from [Hemme] herself." *Id.*

At the time of her guilty plea, Hemme:

> was 21 years of age. She had first received psychiatric treatment in 1972 at age 13 when she attempted suicide. In the eight years which followed, [Hemme] was successively admitted to a number of treatment institutions in Kansas City, St. Louis, Jefferson City, Columbia and in the State of Maryland with the consequence that in the aggregate, she was hospitalized six of the eight years preceding [victim's death]. She attempted suicide three or four times and had a history of seven admissions to the St. Joseph State Hospital where she was a patient at the time of her arrest. According to the state's reconstruction of events, [Hemme] left the hospital the day of the killing and returned there that night.[9]

*Id.* At the beginning of the guilty plea hearing, Hemme "professed not to have a clear recollection of the killing or any of the events that day." *Id.* Her guilty plea was refused.

---

[9]The habeas record establishes that Hemme did not return to St. Joseph State Hospital on the night of victim's murder. She hitchhiked from Dearborn, Missouri to Concordia, Missouri to her parents' home, and arrived somewhere in between 8:30 p.m. and 9:30 p.m.

*Id.* "There is no indication in the record of the plea hearing that the trial court was given any information about [Hemme's] history of institutional treatment or that concern about [Hemme's] competence was at the root of the initial refusal to accept the plea." *Id.* Rather, the court stated that "the testimony offered by [Hemme] was simply not sufficient" to support the plea, and "the state made no offer to show what its proof would be apart from [Hemme's] confession." *Id.*

The prosecutor[10] sought a recess of the guilty plea hearing. *Id.* During the recess, "the prosecutor and [Hemme's] attorney[11] jointly instructed her as to how she should respond to the court's questions to assure acceptance of the plea." *Id.* "The hearing resumed after fifteen minutes, [at which time Hemme] described in some detail to the court the killing of [victim] . . . and the plea was accepted." *Id.* at 735-36. Hemme was sentenced to life imprisonment without parole for fifty years. *Id.* at 736.

Hemme filed a motion pursuant to Rule 27.26[12] to set aside her conviction and sentence on her plea of guilty.[13] "The gist of the motion claim was that criminal trial counsel had failed to make minimal preparation of the defense and had, instead, actively promoted entry of a guilty plea notwithstanding [Hemme's] lengthy history of mental illness induced by drug abuse." *Id.* at 735. During a hearing on the motion, trial counsel

---

[10]P.R. was not the Buchanan County, Missouri assistant prosecutor assigned to handle Hemme's 1981 guilty plea proceedings. P.R. was not assigned to Hemme's case until 1984 when her guilty plea was permitted to be withdrawn.

[11]Hemme was represented at her guilty plea hearing by D.S.

[12]Rule 27.26 is the predecessor to current Rules 24.035 and 29.15.

[13]Hemme's Rule 27.26 motion was filed by L.H., who later became a Circuit Judge. Judge L.H. is now retired from the bench. Judge L.H. testified as a witness on Hemme's behalf during the habeas proceedings.

21

acknowledged that he was "acquainted with [Hemme's] history of hospitalization during the previous eight years and also with her record as a patient at the time the offense was committed." *Id.* at 736. Trial counsel also admitted that Hemme's "history and condition raised a doubt . . . as to her mental capacity at the time the crime was committed." *Id.* Yet, despite his knowledge and doubts, trial counsel filed "no motions or pleadings of any kind in the case," *id.* at 735, and "filed no motion for a mental examination, gave no information to the court as to [Hemme's] history of hospitalization and treatment and . . . gave no notice of intention to rely on the defense of mental disease or defect." *Id.* at 736.

The motion court denied Hemme's Rule 27.26 motion. *Id.* at 734. Hemme appealed. *Id.* We found that the motion court committed clear error in denying Hemme's claim of ineffective assistance of counsel:

> [Hemme's] long history of treatment for mental problems, her repeated attempts at suicide, her then current status as a patient receiving treatment at St. Joseph State Hospital on the date the offense was committed and on the date of her arrest, and her confused initial plea testimony, psychologically described as derealization, were uncontested and, if fully known by the trial court, should have and no doubt would have prompted an inquiry to ascertain [Hemme's] actual mental condition before acceptance of her plea.

*Id.* at 736-37. We held that Hemme "was not afforded her due process right to effective counsel," and reversed her conviction, with instructions that on remand, Hemme should be allowed to withdraw her guilty plea. *Id.* at 737.

Nine months after our decision in *Hemme v. State*, Hemme's capital murder charge was tried to a jury in Buchanan County, Missouri on June 4th and 5th, 1985. The presentation of evidence was completed on the first day of trial. The state was

22

represented at trial by Buchanan County assistant prosecutor P.R. The state's evidence centered around Hemme's December 10, 1980 "transcribed confession" which was read to the jury. Hemme's trial counsel[14] claimed that Hemme's confession was filled with inconsistencies and contradictions and made no sense, and was a false confession. P.R. countered that the evolving statements from Hemme simply represented a "cat-and-mouse" game. Hemme's trial counsel argued that Hemme's confession was unreliable because all that connected her to the murder was contained within the four corners of the confession, and could not be independently verified or corroborated. P.R. responded about details in the confession that "only the killer could know," including the flowered bedspread, the telephone cord used to tie victim's hands, the strangulation with panty hose, the flowered pillow that covered victim's face, the cut antenna wire next to victim's body, and that victim was nude. P.R. also claimed that the items Hemme said she had taken from victim's apartment had never been recovered, and argued by negative inference that Hemme insured the destruction of these items to eliminate evidence that tied her to the murder scene.

Hemme's trial counsel sought to cast suspicion on M.H. as victim's murderer. The state stipulated to M.H.'s use of victim's credit card the day after Hemme's murder, and to the March 4, 1981 FBI Report's reference to the testing of M.H.'s head hair specimen. P.R. discredited the fact that M.H.'s head hair was microscopically consistent with a hair

---

[14]Hemme was represented at trial by attorney R.D., who is now deceased.

found at the murder scene, and argued that a Black investigating officer at the scene, Officer V.B., was the likely contributor of the hair.

Hemme was convicted of capital murder and sentenced to life in prison without parole for fifty years. Hemme's conviction was affirmed by this Court in a *per curiam* order. *State v. Hemme*, 709 S.W.2d 909 (Mo. App. W.D. 1986).

On April 20, 1988, Hemme file a *pro se* motion pursuant to Rule 29.15 seeking to vacate her conviction. Appointed counsel filed an amended motion on April 15, 1992, which alleged that Hemme's trial counsel was ineffective for failing to request a change of venue, for failing to investigate potential defense witnesses, for failing to pursue defenses to commission of the crime of insanity and diminished mental capacity, for failing to request a mental examination, and for failing to introduce Hemme's medical records. Following an evidentiary hearing, the motion was denied. The motion court's denial of Hemme's Rule 29.15 motion was not appealed.

In 2012 and in 2022, attorneys representing Hemme secured SJPD records that caused them to believe that Hemme had been wrongfully convicted. Hemme filed a petition for writ of habeas corpus in the Circuit Court of Livingston County, Missouri on February 21, 2023. The petition asserted five claims:

(1) gateway and freestanding claims of actual innocence, and the gateway of cause and prejudice, based on exculpatory evidence that links M.H. to victim's murder, and based on new evidence that Hemme's statements to police lacked credibility ("Claim 1");

24

(2) a claim that material, exculpatory evidence that implicated M.H. as victim's murderer was suppressed in violation of Hemme's right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963) ("Claim 2");

(3) a claim that the state used a statement Hemme made about discarding victim's purse to argue Hemme's guilt though the state knew or should have known that the statement was false ("Claim 3");

(4) a claim, asserted in the alternative to the argued *Brady* violations, that trial counsel's failure to act upon evidence implicating M.H., *if* the evidence was known to him, constituted ineffective assistance of counsel ("Claim 4"); and

(5) a claim that trial counsel was ineffective for failing to present evidence of Hemme's psychiatrically vulnerable condition during her interrogations by police ("Claim 5").

The habeas court ordered the Warden at the prison where Hemme was incarcerated to show cause why a writ of habeas corpus should not be issued. The Attorney General for the State of Missouri ("Attorney General") represented the Warden and filed a response to the show cause order. The habeas court later granted the Attorney General's motion to dismiss Claim 3. After the completion of discovery, an evidentiary hearing on Hemme's Claims 1, 2, 4, and 5 was conducted in mid-January 2024. Numerous exhibits were admitted into evidence, nearly all by agreement. Testimony was taken from several witnesses, including L.H. (the attorney who secured the appellate decision permitting withdrawal of Hemme's guilty plea); Detective S.F.; J.T. (an expert witness who is a retired career homicide detective and law enforcement trainer on

25

interrogation methods); P.R.; Detective D.G. (who had been M.H.'s training partner); Detective H.J. (who had been assigned to the SJPD crimes-against-property unit in 1980); Dr. J.E. (a board-certified forensic psychiatrist with expertise in factors that increase the risk of a false confession); and N.B. (victim's close friend since childhood).

On June 14, 2024, the habeas court issued a writ of habeas corpus in a 118-page memorandum, order, and judgment that included detailed findings of fact and conclusions of law ("Judgment"). The Judgment granted habeas relief to Hemme on Claims 1, 2, 4, and 5, and thus found in Hemme's favor on her claims of freestanding actual innocence (Claim 1); her gateway claims of actual innocence and cause-and-prejudice permitting habeas review of otherwise procedurally barred claims that Hemme's due process rights were violated (Claim 1); her *Brady* violation claims (Claim 2); and her claims of ineffective assistance of counsel, particularly with respect to the failure to present evidence of Hemme's psychiatrically vulnerable condition during her interrogations by police (Claims 4 and 5). With respect to Hemme's *Brady* claims, the habeas court found the following evidence was suppressed in violation of *Brady*, such that Hemme's due process rights were violated:

1. **Earring Evidence**: December 22, 1980 documents identifying victim's earrings among jewelry found in M.H.'s apartment (Hemme's exhibits 1, 2, and 3)

2. **FBI Report 1981.01.29**: A fingerprint report noting a latent palm print on the antenna wire found near victim's body that excluded victim and

26

Hemme as the source and that requested better prints from M.H. for comparison (Hemme's exhibit 26)

3. **FBI Report 1981.01.30**: A fingerprint report excluding victim as the source of prints on a Playgirl magazine allegedly taken by Hemme from victim's home (Hemme's exhibit 27)

4. **FBI Report 1981.04.24**: A laboratory report excluding SJPD Officer V.B. as the source of black head hairs found at the murder scene on victim's bedsheet (Hemme's exhibit 66)

5. **M.H. Crime Evidence**: Documents regarding the investigation and prosecution of M.H. for crimes, including insurance fraud, three home burglaries, a stalking offense, and other crimes of dishonesty (Hemme's exhibits 38, 39, 40, 41, 50, and 51; and the state's exhibits E and H)

The Judgment ordered Hemme discharged from custody "unless she is brought to trial within 30 days of this order."

The Attorney General filed a petition for writ of certiorari on June 28, 2024, which sought review of the habeas record. This court granted the state's request for a writ of certiorari as a matter of right on July 8, 2024.[15] *State ex rel. Nixon v. Kelly*, 58 S.W.3d

---

[15]The grant of a writ of certiorari following a lower court's grant of habeas relief is not discretionary. *State ex rel. Nixon v. Kelly*, 58 S.W.3d 513, 516 (Mo. banc 2001). The delay in entering our writ of certiorari is attributable to the fact that the state's petition for writ of certiorari was electronically filed after the close of business on Friday, June 28, 2024, and over that weekend, an electrical fire at a data center triggered fire suppression systems that damaged key equipment controlling access to this court's case management system, phone system, email, and shared drives.

513, 516 (Mo. banc 2001). We ordered the Circuit Clerk of Livingston County to return the record of the habeas court proceedings to this court for review, and we ordered the parties to file briefs. We also remanded the habeas proceedings to the habeas court for the limited purpose of determining the conditions that should be set for Hemme's discharge pending our review of the writ of certiorari. *State ex rel. Bailey v. Sengheiser*, 692 S.W.3d 20, 24-26 (Mo. banc 2024) (holding that civil judgments, including those resulting in the vacation of a criminal conviction, are operative from the date of their rendition, and are not automatically stayed on appeal, and that following vacation of a criminal conviction, "the criminal case and the charges as to which the conviction has been vacated are reinstated, and the defendant is remanded to his detention status prior to conviction," and is eligible for release pending retrial on appropriate conditions). Hemme was released from custody on or about July 19, 2024, subject to conditions imposed by the habeas court.[16]

## Standard of Review

"A writ of certiorari requires an inferior court to produce a certified record of a particular case for review for irregularities." *State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 231 (Mo. App. W.D. 2011). Our review for irregularities does not contemplate review of findings of fact, and is instead limited to review of questions of

---

[16]Rule 91.14 provides that "[i]f the person for whose relief a writ of habeas court has been issued is charged with a bailable offense, the court in which the answer is to be filed shall set the conditions of release pursuant to Rule 33." Rule 33.01(a) provides that "[a] defendant charged with a bailable offense shall be entitled to be released from custody pending trial or other stage of the criminal proceedings."

28

law presented by the record before the habeas court. *State ex rel. Koster v. Jackson*, 301 S.W.3d 586, 589 (Mo. App. W.D. 2010)). Certiorari is thus available to correct habeas judgments that exceed a habeas court's authority or abuse its discretion, and that are not otherwise reviewable on appeal. *State ex rel. Koster v. Green*, 388 S.W.3d 603, 606, 606 n.6 (Mo. App. W.D. 2012) (citing *State ex rel. Nixon v. Sprick*, 59 S.W.3d 515, 518 (Mo. banc 2001); *State ex rel. Koster v. McElwain*, 340 S.W.3d at 231; *State ex rel. Koster v. Jackson*, 301 S.W.3d at 589). A "habeas court will have exceeded the bounds of its authority if the evidence as a whole does not support the grant of a writ of habeas corpus in light of the applicable law." *State ex rel. Koster v. Green*, 388 S.W.3d at 606. And, a "habeas court will have abused its discretion if its 'ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Id.* at 606-07 (quoting *State v. Stewart*, 313 S.W.3d 661, 665 (Mo. banc 2010)).

After completing our review of the habeas record for irregularities, we "'either quash the writ or uphold the actions of the habeas court,' 'in whole or in part.'" *Id.* at 607 (quoting *State ex rel. Koster v. Jackson*, 301 S.W.3d at 589, and *State ex rel. White v. Swink*, 256 S.W.2d 825, 827 (Mo. App. 1953)); *see also State ex rel. Nixon v. Jaynes*, 61 S.W.3d 243, 246 n.1 (Mo. banc 2001) ("In certiorari, this Court is limited to either quashing or not quashing the record of the lower court."). "Where, as here, several avenues permitting habeas corpus review and several Claims of constitutional infirmities were found [by the habeas court] to have merit, we need only determine that at least one avenue permits habeas review, and that at least one Claim has merit." *State ex rel. Koster*

*v. McElwain*, 340 S.W.3d at 232.  That is because the effect of a writ of habeas corpus will be the same whether one or several grounds for its issuance have merit, as "[a] writ of habeas corpus merely operates to vacate a conviction where principals of justice and fundamental fairness require, permitting the State to retry the defendant should it so elect."  *Id.* (emphasis omitted).

**Analysis**

The Attorney General's petition for writ of certiorari sought review of the habeas record, and identified twenty-eight alleged irregularities.  However, the Attorney General's brief, which was filed in this proceeding at our request, narrows the claimed irregularities to thirteen, falling into three discrete categories.  Two claimed irregularities relate to Hemme's freestanding actual innocence claim,[17] and contend that under binding Missouri precedent, a freestanding actual innocence claim is not cognizable for state habeas corpus relief in non-death penalty cases (Points One and Two).  Three claimed irregularities relate to the habeas court's determination that Hemme established that her trial counsel was ineffective (Points Three, Four, and Five).  And eight claimed irregularities relate to the habeas court's determination that Hemme established *Brady* violations (Points Six through Thirteen).

---

[17]Unlike "traditional" claims for habeas relief which urge that a defendant received a constitutionally infirm trial and that a "gateway" permits review of the claimed constitutional violation even though it was not raised on direct appeal or in a timely post-conviction motion, a freestanding actual innocence claim does not challenge the constitutional fairness of a defendant's trial, and instead contends that new evidence clearly and convincingly establishes the defendant's actual innocence requiring vacation of the defendant's conviction and a new trial, even though the defendant had a fair trial. *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 546-48 (Mo. banc 2003).

30

Because we need not review all determined avenues for habeas relief if we conclude as to even one avenue that the habeas record should not be quashed, we elect to first address the eight irregularities raised by the Attorney General related to the determined *Brady* violations.

## I.

***Habeas Review Is Permitted for Procedurally Defaulted Claims if a Gateway for Review Is Established, and the Habeas Record Supports the Habeas Court's Conclusion that Hemme Established the Gateway of Cause and Prejudice and the Gateway of Manifest Injustice/Innocence***

"[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government." *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 125 (Mo. banc 2010) (quoting *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 545 (Mo. banc 2003)). However, "habeas corpus is not a substitute for appeal or post-conviction proceedings." *State ex rel. Simmons v. White*, 866 S.W.2d 443, 446 (Mo. banc 1993). If a defendant "fails to raise a challenge to his conviction on direct appeal or in a timely post-conviction proceeding" the defendant "'is said to have procedurally defaulted on those claims.'" *In re Ferguson v. Dormire*, 413 S.W.3d 40, 52 (Mo. App. W.D. 2013) (quoting *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 214 (Mo. banc 2001), *overruled on other grounds by State ex rel. Zinna v. Steele*, 301 S.W.3d 510 (Mo. banc 2010)).

> Procedurally defaulted claims cannot be raised in a petition for writ of habeas corpus unless: (1) the claim relates to a jurisdictional issue; or (2) the petitioner establishes "a showing by the preponderance of the evidence of actual innocence, [that] would meet the manifest injustice standard for

31

habeas relief under Missouri law," (a "gateway of innocence claim")[18]; or (3) the petitioner establishes "cause for failing to raise the claim in a timely manner and prejudice from the constitutional error asserted,'" (a "gateway cause and prejudice claim").

*Id.* at 52-53 (Mo. App. W.D. 2013) (emphasis omitted) (quoting *State ex rel. Amrine v. Roper*, 102 S.W.3d at 546). "Establishment of either 'gateway' does not [itself] support habeas relief, but serves to permit habeas review of a constitutional challenge regarding the fairness of the defendant's trial that is otherwise procedurally defaulted." *Id.* at 53 (quoting *State ex rel. Amrine v. Roper*, 102 S.W.3d at 546).

In Claim 2 of the habeas petition, Hemme argued that the state failed to disclose exculpatory, material evidence in violation of her right to due process pursuant to *Brady*. Hemme did not raise *Brady* violations on direct appeal or in her Rule 29.15 motion. However, in Claim 1 of the habeas petition, Hemme alleged that her *Brady* claims were eligible for habeas review through the gateway of manifest injustice based on evidence of innocence, and through the gateway of cause and prejudice.

"To establish the manifest injustice/gateway of innocence, a defendant [must] establish by a preponderance that newly discovered evidence suggests an innocent person has been convicted." *Id.* at 54 n.22 (quoting *State ex rel. Amrine v. Roper*, 102 S.W.3d at

---

[18]A gateway of innocence claim is distinct from a freestanding actual innocence claim as the former is not raised as an independent basis for habeas relief, but merely to authorize review of a claimed constitutional violation that, but for the gateway, would be procedurally defaulted. The gateway of innocence claim is largely established by the same "proof" as would be relevant to a freestanding actual innocence claim, but the burden of proof for the gateway of innocence claim is a preponderance of the evidence, where the burden of proof for the freestanding actual innocence claim is clear and convincing evidence. *In re Ferguson v. Dormire*, 413 S.W.3d at 54 n.22 (citing *State ex rel. Amrine v. Roper*, 102 S.W.3d at 546-48).

546).  A manifest injustice is demonstrated if the defendant can "show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent'" because "'it is more likely than not that no reasonable juror would have convicted him in light [of new evidence of innocence].'"  *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. banc 2000) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

"The 'cause' component of the gateway of cause and prejudice refers to the 'cause' for the defendant's procedural default."  *State ex rel. Koster v. McElwain*, 340 S.W.3d at 246.  "That cause 'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'"  *Id.* (quoting *State ex rel. Nixon v. Jaynes*, 63 S.W.3d at 215 (itself quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986))).  "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . would constitute cause under this standard."  *Id.* (emphasis omitted) (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)).  "To establish the 'prejudice' necessary to overcome procedural default, a petitioner . . . bears the burden of showing, not merely that errors at his trial created [the] possibility of prejudice, but that they 'worked to [her] actual and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions.'"  *State ex rel. Nixon v. Jaynes*, 63 S.W.3d at 215 (quoting *United States v. Frady*, 456 U.S. 152, 178 (1982)).

The cause and prejudice prongs are largely coextensive with two of the essential elements of a *Brady* violation.  For example, "[e]vidence that has been deliberately concealed by the state is not reasonably available to counsel [for the defense] and

33

constitutes cause for raising otherwise procedurally barred claims in a petition for writ of habeas corpus." *State ex rel. Clemons v. Larkin*, 475 S.W.3d 60, 76 (Mo. banc 2015) (citing *Amadeo v. Zant*, 486 U.S. 214, 222 (1988)). In short, if the state was obligated to disclose evidence but failed to do so, and if a defendant did not have access to the evidence prior to trial by the exercise of reasonable diligence, then it can be fairly said that "cause" external to the defense prevented the defendant from complying with the state's procedural rules. *See, e.g.*, *State v. Salter*, 250 S.W.3d 705, 714 (Mo. banc 2008) (observing that the state cannot be faulted for nondisclosure of exculpatory evidence if the defendant had knowledge of the evidence at the time of trial). As for "prejudice," it is a long settled-principle that "prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brad*y purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

The habeas court found that the state did not allege that Hemme's *Brady* claims were procedurally defaulted until it raised the issue in its post-hearing brief. The habeas court found that procedural bar is an affirmative defense that the state was obligated to raise in advance of the habeas hearing, and that the state waived the defense by not timely asserting it in response to the court's show cause order, or by the deadline for filing dispositive motions set by the court's scheduling order. *Trest v. Cain*, 522 U.S. 87, 89 (1997) (holding that procedural default is not a jurisdictional matter, and is instead a defense that must be raised by the state or it is lost). The Attorney General has not claimed any irregularity with respect to this finding and conclusion, and is bound by the

34

habeas court's determination that the defense of procedural default precluding review of Hemme's *Brady* claims was waived.

The habeas court alternatively found that the habeas record established both gateways relied on by Hemme. With respect to the gateway of manifest injustice/innocence, the habeas court found:

> [T]he evidence shows that . . . Hemme's statements to police are so unreliable and . . . the evidence pointing to [M.H.] as the perpetrator of the crime so objective and probative that no reasonable juror would find . . . Hemme guilty, and this Court can thus reach the merits of . . . Hemme's claims because she is the victim of a manifest injustice.

The Attorney General has not claimed any irregularity with respect to the habeas court's alternative finding that the gateway of manifest injustice/innocence was established by Hemme, and is bound by the determination that this gateway permits review of Hemme's *Brady* claims, even if deemed to have been procedurally defaulted.

With respect to the gateway of cause and prejudice, the habeas court noted the substantial overlap between the cause and prejudice standard and the establishment of a *Brady* violation, found that the state failed to disclose exculpatory evidence that was material, and found that as a result, Hemme established cause and prejudice for not presenting the *Brady* claims in previous proceedings. The Attorney General has not claimed any irregularity with respect to the habeas court's alternative finding that the gateway of cause and prejudice was established by Hemme, and is bound by the determination that this gateway permits review of Hemme's *Brady* claims, even if deemed to have been procedurally defaulted.

35

Because the habeas court found Hemme's *Brady* claims to be eligible for habeas review, we turn our attention to a discussion of the essential elements of a *Brady* violation, to the five *Brady* violations found by the habeas court, and to the irregularities raised by the Attorney General with respect to the determined *Brady* violations.

**II**.

### *The Essential Elements of a* **Brady** *Claim*

"Under *Brady*, due process requires that the prosecution disclose to the defendant any evidence in its possession that is favorable to him and that is material to his guilt or punishment." *State ex rel. Engel v. Dormire*, 304 S.W.3d at 127. "*Brady* provides that 'the individual prosecutor has a duty to learn of any favorable evidence known to *the others acting on the government's behalf* in the case, including the police.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (emphasis added)).

> The prosecutor's lack of knowledge about information asserted in a *Brady* claim is not an impediment because the prosecutor is considered "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

*Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

To prevail on her *Brady* claims, Hemme "must show each of the following: (1) the evidence at issue is favorable to [her], either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) [s]he was prejudiced." *Id.* at 126. To determine "whether . . .

36

evidence meets the test for *Brady* prejudice, this Court must assess whether the evidence at issue is material to [Hemme's] case." *Id.* at 128.

> The materiality standard for *Brady* claims is established when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [s]he received a fair trial . . . resulting in a verdict worthy of confidence." *Id.* at 434.

*State ex rel. Engel v. Dormire*, 304 S.W.3d at 128. If materiality is established by this standard, then "'the suppression . . . violates due process . . . irrespective of the good or bad faith of the prosecution.'" *Merriweather v. State*, 294 S.W.3d 52, 54 (Mo. banc 2009) (quoting *Brady*, 373 U.S. at 87).

## III.

### *The* **Brady** *Violations Found by the Habeas Court and the Irregularities Argued by the Attorney General with Respect to the Determined Violations*

The habeas court found the following evidence was alleged by Hemme in her post-hearing brief to have been suppressed in violation of *Brady*, and that the evidence was, in fact, exculpatory, suppressed, and material, such that Hemme's due process rights were violated: three December 22, 1980 documents that collectively operated to identify victim's earrings among jewelry found in a search of M.H.'s apartment (Hemme's exhibits 1, 2, and 3) (hereinafter the "Earring Evidence"); FBI Report 1981.01.29, a fingerprint report noting that a latent palm print on the antenna wire found near victim's body did not belong to either victim or Hemme, and that requested better prints from M.H. for comparison before he could be ruled out as the source of the palm print (Hemme's exhibit

26) (hereinafter the "January 29, 1981 FBI Report"); FBI Report 1981.01.30, a fingerprint report excluding victim as the source of prints on a Playgirl magazine allegedly taken by Hemme from victim's home (Hemme's exhibit 27) (hereinafter the "January 30, 1981 FBI Report"); FBI Report 1981.04.24, a laboratory report excluding SJPD Officer V.B. as the source of head hairs found at the murder scene on victim's bedsheet (Hemme's exhibit 66) (hereinafter the "April 24, 1981 FBI Report"); and M.H. crime evidence comprised of numerous documents regarding the investigation and prosecution of M.H. for insurance fraud, and the investigation of M.H. for other crimes, including three home burglaries, a stalking offense, and other crimes of dishonesty (Hemme's exhibits 38, 39, 40, 41, 50, and 51; and the state's exhibits E and H) (hereinafter "M.H. Crime Evidence").

The Attorney General's Eighth, Tenth, and Twelfth Points argue that the habeas court committed legal error when it found *Brady* violations relating to the three FBI Reports because their suppression was not raised in Hemme's habeas petition, and because claims regarding their suppression were not tried by implied consent.

The Attorney General's Ninth Point argues (in part) that there was no substantial evidence supporting a finding that the January 30, 1981 FBI Report was suppressed.

The Attorney General's Thirteenth Point argues (in part) that there was no duty to disclose the M.H. Crime Evidence.

The Attorney General's Sixth, Seventh, Ninth (in part), Eleventh, and Thirteenth (in part) Points argue that Hemme failed to demonstrate that the *Brady* evidence found to have been suppressed was material.

38

We address the Attorney General's alleged irregularities in the order noted above. We observe before doing so, however, that the Attorney General does not argue that the evidence found to have been suppressed was known, or could reasonably have been known, to Hemme or her counsel at the time of trial. Though the Attorney General challenges whether the M.H. Crime Evidence had to be disclosed, the Attorney General does not challenge that the Earring Evidence and the three FBI Reports were exculpatory because they were favorable to Hemme. And though the Attorney General challenges whether the January 30, 1981 FBI Report was suppressed, the Attorney General does not challenge that the Earring Evidence, the January 29, 1981 FBI Report, the April 24, 1981 FBI Report, and the M.H. Crime Evidence were suppressed.

**A**.

**The Habeas Court Did Not Exceed or Abuse Its Authority by Considering *Brady* Violations Involving Suppressed FBI Reports that Hemme Did not Learn About Until After Her Habeas Petition Was Filed (Points Eight, Ten and Twelve)**

In Points Eight, Ten and Twelve, the Attorney General claims irregularities with respect to the three FBI Reports found to have been suppressed, arguing their suppression was not pled in the original petition for writ of habeas corpus, nor tried by implied consent, rendering it legally erroneous for the habeas court to have considered the three FBI Reports to support finding *Brady* violations. We disagree.

The three FBI Reports found to have been suppressed were not identified in Hemme's petition for writ of habeas corpus relief as alleged *Brady* violations, but were argued to be *Brady* violations supported by the evidence in Hemme's post-hearing brief. The habeas court found that the "FBI Crime Lab evidence . . . was produced by [the state]

39

during discovery" conducted in connection with the habeas proceedings. The habeas court found that the three FBI Reports were admitted into evidence without objection, which our review of the transcript confirms. In addition, during the evidentiary hearing, P.R., confirmed (without objection) that the January 29, 1981 FBI Report and the April 24, 1981 FBI Report were not in his prosecution file, and were not known to him at the time of trial, and thus would not have been made available to Hemme prior to trial.[19] The habeas court concluded that the issue of suppression of the three FBI Reports in violation of *Brady* was tried by implied consent, and that Hemme's petition for writ of habeas corpus would be deemed amended to conform to the "newly elicited evidence" pursuant to Rule 55.33(b).[20]

The Attorney General does not challenge the habeas court's finding that Hemme did not learn about the three FBI Reports until they were produced during discovery conducted in connection with the habeas proceedings, or that the three FBI Reports were admitted into evidence during the habeas hearing without objection. It is patently obvious that Hemme could not have made specific reference to the three FBI Reports in her original habeas petition because she did not know about them. Nonetheless, the Attorney General complains that the trial court's ruling permitting amendment of Hemme's habeas petition by implied consent was improper because the three FBI Reports

---

[19]P.R. was not expressly asked about the January 30, 1981 FBI Report during his habeas hearing testimony, a subject we address, *infra*, in connection with the Attorney General's Ninth Point.
[20]Rule 91.10 addressing habeas petitions expressly provides that "[a]ny pleading may be amended or supplemented as provided in Rule 55.33."

were otherwise admissible on Hemme's freestanding actual innocence and gateway of innocence claims (explaining the state's lack of an objection at trial), and the improper amendment "allowed Hemme to try more *Brady* claims by ambush than those she actually pled."

The irony of the Attorney General's contention is not lost on this Court. The Attorney General's assertion that ***the state*** was ambushed by exculpatory evidence Hemme did not know about until discovery was conducted after her habeas petition was filed borders on the absurd. "[P]rosecutors are 'bound by the ethics of [their] office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of [a] conviction.'" *State v. Johnson*, 617 S.W.3d 439, 450 (Mo. banc 2021) (Stith, J., concurring) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976)). That duty is not suspended by the filing of a habeas petition as to permit the Attorney General to hide behind the cloak of *Brady* claims specifically pled in a habeas petition. In fact, this Court unambiguously held in *State ex rel. Koster v. Oxenhandler*, 491 S.W.3d 576, 591 (Mo. App. W.D. 2016), that "it is not necessary that a writ of habeas corpus be issued based on a claim pled in a habeas petition." We noted that Rule 91.06 provides that:

> Whenever any court of record, or any judge thereof, shall have evidence from any judicial proceedings had before such court or judge that any person is illegally confined or restrained of liberty within the jurisdiction of such court or judge, it shall be the duty of the court or judge to issue a writ of habeas corpus for the person's relief, ***although no petition be presented for such writ***.

41

*Id.* "A court's *sua sponte* obligation to issue a writ of habeas corpus 'although no petition be presented for such writ' negates the State's contention that habeas claims must be preserved in habeas pleadings as a condition of affording habeas relief." *Id.* (quoting Rule 91.06).

It is therefore irrelevant whether the habeas court properly deemed Hemme's habeas petition amended by implied consent. Any rule "'declaring prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.'" *Banks*, 540 U.S. at 696. "To suggest, as the State does, that [Hemme] should be penalized for the State's failure to timely honor its legal disclosure obligations by having [the three FBI Reports] entirely disregarded [because they were not known to Hemme until after she filed her habeas petition] is repugnant to the concept of fundamental fairness." *In re Ferguson v. Dormire*, 413 S.W.3d at 59 (quotation omitted).

It was not error for the habeas court to rely on the three FBI Reports to find determined *Brady* violations. The Attorney General's Points Eight, Ten, and Twelve are without merit and are denied.

**B**.

**The Habeas Court Did not Exceed or Abuse Its Authority When It Concluded that the January 30, 1981 FBI Report Was Suppressed (Point Nine)**

In Point Nine, the Attorney General claims irregularities with respect to the *Brady* violation involving the January 30, 1981 FBI Report, a fingerprint report excluding victim as the source of prints on a Playgirl magazine allegedly taken by Hemme from victim's home. The Attorney General argues that the habeas court's conclusion that this

FBI fingerprint report was suppressed is "unsupported by any substantial evidence," and that the report was not material. We focus our present discussion on the Attorney General's challenge to the finding that this Report was suppressed, as we address the Attorney General's materiality challenges to all of the suppressed evidence collectively, *infra*.

"Substantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Ivie v. Smith*, 439 S.W.3d 189, 199 (Mo. banc 2014). "To prevail on the substantial-evidence challenge, [the Attorney General] must demonstrate that there is no evidence in the record tending to prove a fact that is necessary to sustain the circuit court's judgment as a matter of law." *Id.* at 200. We apply this standard, and its corresponding burden of proof, with particular care on writ of certiorari, where "we do not review findings of fact," and determine "the sufficiency of the evidence to support the writ of habeas corpus as a whole," as "a question of law." *State ex rel. Koster v. Oxenhandler*, 491 S.W.3d at 590 (citing *State ex rel. Nixon v. Sprick*, 59 S.W.3d at 518). In doing so, "[w]e assume the habeas court made findings of fact warranted by the evidence sufficient to sustain the habeas judgment." *Id.* (quoting *State ex rel. Shartel v. Skinker*, 25 S.W.2d 472, 478 (Mo. banc 1930)).

In arguing that the habeas court's conclusion that the January 30, 1981 FBI Report was suppressed is unsupported by any substantial evidence, the Attorney General focuses exclusively on the testimony of P.R. The Attorney General notes that the January 30, 1981 FBI Report (Hemme's Exhibit 27) was never shown to P.R., and that P.R. never expressly testified about whether he had seen the Report. Both observations are true.

43

But, the Attorney General ignores that P.R. also identified state's Exhibit D as his prosecution file, and testified that the file had been made available to Hemme's trial attorney as a part of the prosecuting attorney's "open file" policy. P.R. was specifically asked about the January 29, 1981 FBI Report (Exhibit 26) and the April 24, 1981 FBI Report (Exhibit 66), and confirmed that he had not previously seen either Report, and that neither was in the prosecution file that would have been made available to Hemme prior to her trial. Though P.R. was not asked about the January 30, 1981 FBI Report, a simple review of Exhibit D confirms that Report is also not included in the prosecution file, supporting the conclusion that it was suppressed.

Moreover, although P.R. was not asked directly about the January 30, 1981 FBI Report, he confirmed during his habeas hearing testimony that he argued a negative inference during Hemme's 1985 trial based on the fact the items she told police she had taken from victim's apartment (the CPO jacket, a Playgirl magazine, gloves, and a bandana) were never recovered, suggesting Hemme had destroyed evidence that could link her to victim's murder. In connection with other questioning, P.R. repeatedly confirmed that he would never make an argument in a criminal case he knew not to be true. The habeas court characterized P.R. as a candid and credible witness. We consistently conclude, therefore, that when P.R. argued that Hemme destroyed items she claimed to have taken from victim's home to prevent being connected to the crime scene, P.R. did not appreciate that the SJPD had retrieved those items from Hemme's parents' home on December 1, 1980; did not appreciate that those items had been sent to the FBI for analysis; did not know about the January 30, 1981 FBI Report addressing fingerprints

44

found on the Playgirl magazine because that Report was not in the prosecution file; and failed to appreciate that when read together, the only two FBI Reports that were in the prosecution file, (the March 4, 1981 FBI Report and the March 12, 1981 FBI Report), confirmed that victim's fingerprints were not found on the jacket, bandana, or gloves.[21] In fact, during the habeas hearing, P.R. was shown the March 12, 1981 FBI Report, and testified he had no recollection of ever seeing it before.

The January 30, 1981 FBI Report was important, as it noted that "[f]ifty-six latent fingerprints and twelve latent palm prints . . . were developed on the 'PLAYGIRL' magazine;" that forty-nine of the fifty-six fingerprints, and all twelve of the palm prints belonged to Hemme, and that none of the fingerprints or palm prints belonged to victim. Just as the March 12, 1981 FBI Report did with respect to the CPO jacket, the bandana, and the red gloves, the January 30, 1981 FBI Report confirmed that the Playgirl magazine did not connect Hemme to victim or to victim's murder.

The habeas record as a whole supports the habeas court's conclusion that the January 30, 1981 FBI Report was suppressed. The Attorney General's Point Nine is

---

[21]Evidence custody records that are a part of the prosecution file that was admitted into evidence during the habeas hearing noted a jacket, a pair of red gloves, and a bandana were "booked" into evidence on December 9, 1980 by SJPD officers. A Playgirl magazine is noted immediately above these entries. The habeas record establishes that these items were taken from Hemme's parents' home on December 1, 1980, four days before she first made any reference to them in a statement given to Detective S.F. on December 5, 1980. As previously noted, the March 12, 1981 FBI Report in the prosecution file notes that Caucasian hair found on 4 items of evidence (noted as Q31-Q34) did not belong to victim. Items Q31-Q34 are identified in the March 4, 1981 FBI Report in the prosecution file as a jacket, a pair of gloves, and a bandana, respectively.

denied to the extent it alleges that no substantial evidence supports the conclusion that the January 30, 1981 FBI Report was suppressed.

C.

**The Habeas Court Did Not Exceed or Abuse its Authority When It Concluded that Evidence About Other Crimes M.H. Was Accused of Committing Was Subject to the Disclosure Obligation Imposed by *Brady* (Point Thirteen)**

In Point Thirteen, the Attorney General claims irregularities with respect to the determined *Brady* violation involving M.H. Crime Evidence, which consisted of documents regarding the investigation and prosecution of M.H. for other crimes, including insurance fraud, three home burglaries, a stalking offense, and other crimes of dishonesty. The Attorney General argues that it was error to conclude that this evidence was subject to a disclosure obligation. The Attorney General also argues that in any event, the evidence was not material. We focus our present discussion on the Attorney General's contention that this evidence was not subject to a disclosure obligation, as we address the Attorney General's materiality challenges to all of the suppressed evidence collectively, *infra*.

The M.H. Crime Evidence involved numerous documents reflecting investigations into and prosecutions of M.H. for several crimes during 1980 and 1981, many of which were committed while M.H. was employed as an SJPD officer. The Attorney General does not contest the habeas court's conclusion that this evidence was not disclosed to Hemme. Instead, the Attorney General argues that the evidence did not have to be disclosed. The Attorney General notes that in an April 26, 1985 disclosure, the state did

46

not endorse M.H. as a possible witness at Hemme's upcoming trial, and that the state has no duty to provide evidence of criminal history for persons it does not intend to call as witnesses at trial because impeachment evidence is of no value unless the person the evidence would impeach is a witness. The Attorney General cites *State v. Moore*, 411 S.W.3d 848 (Mo. App. E.D. 2013), for this proposition. *Moore* does not stand for this proposition.

*Moore* differentiated between the duty to disclose imposed on a prosecutor by Rule 25.03(A)(7), and the broader duties to disclose exculpatory and impeachment evidence imposed on a prosecutor by *Brady*. *Moore*, 411 S.W.3d 853-54. After explaining the differences between the two disclosure standards, the Eastern District found that a witness's prior suspended imposition of sentence did not constitute "prior criminal conviction" impeachment evidence that had to be disclosed pursuant to Rule 25.03(A)(7) with respect to the state's witnesses, but that a suspended imposition of sentence is impeachment evidence that must be disclosed under *Brady*. *Moore*, 411 S.W.3d at 853-54. *Moore* did not address whether the obligation under *Brady* to disclose prior criminal conduct impeachment evidence is limited to whether the criminal conduct involves a witness the government intends to call at trial.

Even if we accept the Attorney General's argument, it ignores that the M.H. Crime Evidence was not merely impeaching. Instead, the M.H. Crime Evidence was required to be disclosed because it was independently exculpatory irrespective of impeachment because it supported the argument that M.H., and not Hemme, murdered victim. In an effort to minimize the exculpatory nature of the M.H. Crime Evidence, the Attorney

47

General faults the habeas court for not "explain[ing] how the fact that M.H. committed completely unrelated criminal offenses would connect him to the victim's murder or create the motive or opportunity for the murder." However, the Attorney General's assertion is disingenuous. The connections between the M.H. Crime Evidence and victim's murder are facially obvious in light of the habeas court's uncontested factual findings.

M.H. reported his white 1978 Ford F-150 pickup truck had been stolen on July 14, 1980, and received an insurance payout of $4,350. M.H. also reported his home had been burglarized on the same day. On December 18, 1980, the SJPD opened an investigation into M.H. for insurance fraud related to the reported theft of his truck. M.H. had been seen driving the truck that same day by his then-training partner, Detective D.G., who reported the incident.

This insurance fraud investigation began just over a month after victim's murder, and just over a week after Hemme's December 10, 1980 confession to victim's murder. Importantly, shortly after victim's murder, several eyewitnesses told investigators that they had seen a white pickup truck parked near victim's home the night she was killed. The truck was reported to be in the lane directly next to victim's apartment complex in the 5:30 p.m. to 7:30 p.m. time frame. The eyewitness reports about the truck sighting were significant during the early investigation into victim's murder. A Detective with the SJPD testified during the habeas hearing that "it was well-known within the department that the white pickup truck seen parked near [victim's] apartment the night she was killed was the same truck [M.H.] reported stolen in July of that year." Yet, even though the

48

white truck seen near victim's apartment at the time of her murder belonged to M.H., M.H.'s insurance fraud investigation related to that truck was never reported to Hemme.

M.H. was arrested on suspicion of insurance fraud related to his truck on December 18, 1980. That information was not reported to Hemme. His apartment and storage locker were searched, and evidence that he had staged the burglary of his home was discovered, as well as items stolen during a September 12, 1980 burglary at 1811 Gooding Avenue. M.H. admitted to the false report of the theft of his vehicle, and said he committed the crime because he needed the money. His motivation for committing crimes because he needed the money was not reported to Hemme. The fact that M.H. was connected to a home burglary that occurred just two months before victim was murdered, and her home was burglarized, was not reported to Hemme.

On December 19, 1980, the same day as M.H.'s interrogation about victim's homicide, his apartment was searched a second time for evidence of "burglary" and "homicide." Two jewelry boxes were found that M.H.'s wife said were not hers and that she had never seen before in her life. This search and the results of the search were not provided to Hemme, even though the search yielded earrings that were identified by victim's father as belonging to victim. On December 22, 1980, the parents of victim came to the police station to view jewelry recovered from the December 19, 1980 search. Detective S.F. conducted the interview of Victim's parents. Victim's father identified a pair of "two wishbone shaped pierced type earrings which have a small green stone in them" as earrings he had purchased in Montana in 1962 or 1963 as a gift for his daughter, and reported that he had seen his daughter wearing the earrings since that time.

49

Detective S.F. bagged and sealed the earrings and had victim's father initial the seal. Detective S.F. prepared a police report noting that the earrings had been identified by victim's father, and that the earrings were found by two other officers during a December 19, 1980 search at 3603 Genefield Apartment A13. Victim's father also made a written statement about his identification of the earrings. And, Detective S.F. prepared an evidence custody report documenting the earrings' entry into evidence under victim's homicide investigation number. The evidence custody report notes that the earrings had been retrieved from M.H. All three of these documents (Detective S.F.'s police report and evidence custody report, and victim's father's written statement) were identified by Detective S.F. during the habeas hearing. These documents are the Earring Evidence found by the habeas court to have been the suppressed, a conclusion the Attorney General does not challenge.

On June 8, 1981, M.H. pled guilty in connection with the insurance fraud charge relating to the theft of his white pickup truck, the same truck spotted near victim's apartment during the time frame of her murder. His petition to enter a guilty plea reflected the state's promise "to dismiss all pending charges against me with the exception of the offense to which I am pleading guilty and otherwise not prosecute me for any other criminal matters now under investigation." P.R. testified during the habeas hearing that he prosecuted M.H. in 1981, and that although he did not recall the M.H. plea agreement, the agreement as written indicates that M.H. could not be prosecuted for victim's murder. This plea agreement was not provided to Hemme.

50

While awaiting sentencing for insurance fraud, M.H.'s criminal conduct continued. Records indicate that M.H. committed at least two more home burglaries in the summer of 1981. On June 26, 1981, he took a purse with a cash card and a checkbook-- circumstances strikingly similar to M.H.'s admitted possession of victim's purse and credit card. Several days later, M.H. used one of the stolen checks to purchase a Sony Walkman from a store managed by his brother-in-law, a course of conduct very similar to M.H.'s attempt to use victim's credit card to purchase a camera lens the day after her murder. Later that same summer, M.H.'s brother-in-law caught M.H. inside his home hiding in a basement closet. M.H. left after being confronted, and the brother-in-law then found credit card information that had been in a file cabinet drawer wedged in his couch.

In addition, Detective D.G. was investigating reports by victims of recent sexual assaults that a prowler was peering into their windows at night. A shirtless Black man was spotted by Detective D.G. on June 27, 1981, but evaded apprehension. Then on June 30, 1981, Detective D.G. saw a Black man along the same path and observed the man peeping into a lighted window of one of the apartments in the area. The man was arrested, and immediately recognized by Detective D.G. as his former training partner, M.H. M.H. offered an implausible explanation for his conduct that involved checking on a friend's wife, rivaling his implausible and unverifiable explanation for being near victim's apartment at the time she was murdered.

M.H.'s crime spree ended on August 12, 1981, when he was sentenced to two years in the custody of the Missouri Department of Corrections for insurance fraud.

It is incredulous that the Attorney General believes this crime evidence is not independently exculpatory in light of other evidence that connects M.H. to victim's murder. The habeas record as a whole supports the habeas court's conclusion that M.H.'s Crime Evidence was subject to disclosure pursuant to *Brady*.

The Attorney General's Point Thirteen is denied to the extent it alleges that the state had no duty to disclose the M.H. Crime Evidence.

**D**.

**The Habeas Court Did Not Exceed or Abuse Its Authority When It Concluded that the *Brady* Evidence, Viewed Collectively, Was Material (Points Six, Seven, Nine, Eleven, and Thirteen)**

In Points Six, Seven, Nine, Eleven, and Thirteen, the Attorney General claims irregularities with respect to all of the determined *Brady* violations, arguing that the habeas court exceeded its authority by finding the suppressed evidence to be material. The *Brady* materiality analysis requires consideration of suppressed items collectively. *Kyles*, 514 U.S. at 436-37. Although "the tendency and force of . . . undisclosed evidence" can be evaluated "item by item," the cumulative effect for purposes of materiality is evaluated separately. *Id.* at 436 n.10.

The materiality standard for *Brady* claims is established when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *State ex rel. Engel v. Dormire*, 304 S.W.3d at 128 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). "The question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence [s]he received a fair trial . . . resulting

52

in a verdict worthy of confidence." *Id.* (quoting *Kyles*, 514 U.S. at 434); *see also*

*Strickler*, 527 U.S. at 292 (holding that the "materiality inquiry is not just a matter of

determining whether, after discounting the inculpatory evidence in light of the

undisclosed evidence, the remaining evidence is sufficient to support the jury's

conclusions").

In Hemme's case, the evidence supporting her conviction was limited to her

December 10, 1980 confession.  P.R. (who prosecuted the case for the state) testified at

the habeas hearing that without Hemme's confession there "was zero evidence connecting

her to the offense."  Though Hemme's confession was  sufficient evidence to support her

conviction, the suspect reliability of Hemme's confession is central to a *Brady* materiality

analysis.  That is particularly so given Hemme's defense strategy at trial to argue that

M.H. murdered victim.  All of the suppressed evidence identified by the habeas court is

exculpatory because it supports the conclusion that despite Hemme's confession, Hemme

had no connection to the murder scene, and that someone other than Hemme, namely

M.H., murdered victim.

The habeas record reveals a troubling realization.  All of the suppressed evidence

became known to the SJPD ***shortly after*** Hemme's December 10, 1980 confession had

been extracted, and reported to the public.  The M.H. Crime Evidence began

accumulating on December 18, 1980, when he was first interviewed about insurance

fraud involving his reportedly stolen truck.  It became widely known within the SJPD at

about that same time that the white truck seen near victim's apartment at the time of her

murder was the truck M.H. had fraudulently reported stolen.  On December 19, 1980, the

53

day after the insurance fraud investigation involving M.H. was initiated, the SJPD learned that the person who attempted to use victim's credit card the day after victim was murdered was M.H. M.H. was interviewed that same day about victim's murder. The alibi M.H. provided for being near the scene at the time of the murder could not be confirmed. M.H.'s claim to have found victim's purse with the credit card inside near where his truck was parked at the scene, and his claim that he took the purse and threw it in a dumpster at his apartment complex, was in irreconcilable conflict with Hemme's December 10, 1980 confession that she took victim's purse and threw it in a ditch near 6th Street in Kansas City, Missouri. Yet, M.H.'s claim about having been in possession of victim's purse had to be true, as there is no other explanation for how he happened to be in possession of victim's credit card.

A December 19, 1980 search of M.H.'s apartment led to the discovery of two jewelry boxes unrecognized by his wife. When the jewelry was shown to victim's parents, victim's father identified a unique pair of earrings as a gift he had given his daughter years before and that he had seen her wearing. The police report about this interview, the interview itself, and the evidence custody report logging the earrings as evidence in victim's murder, and noting the earrings had been "retrieved" from M.H. were exculpatory and connected M.H. to victim's murder. But this critical Earring Evidence was suppressed. The Attorney General argues the Earring Evidence was not material for *Brady* purposes because other records suggested an unrelated third person also claimed the wishbone-shaped earrings found in M.H.'s apartment might be theirs. That the ultimate ownership of the earrings might be subject to contradictory evidence makes the

54

suppressed Earring Evidence no less material to Hemme, especially when viewed cumulatively to the other evidence linking M.H., and not Hemme, to victim's murder. During the habeas hearing, P.R. said that he thought he was aware, generally, that earrings had been found in M.H.'s apartment, but vaguely recalled that they could not be affirmatively identified as victims. P.R. acknowledged, however, that the Earring Evidence was not in the prosecution file, and therefore would not have been provided to Hemme. P.R. testified that had Hemme's trial counsel known about the Earring Evidence, there is every reason to believe that counsel would have used the evidence to further the defense strategy that M.H. murdered victim, not Hemme.

The SJPD submitted fingerprint, palm print, and hair samples from M.H. to the FBI after the mid-December revelations connecting M.H. to victim's murder. FBI Reports that should have sharpened the focus on M.H. were ignored. The January 29, 1981 FBI Report that asked for a clearer palm print from M.H. because the palm print he had provided was not clear enough to permit him to be excluded as the source of the palm print on the antennae wire found next to victim's body at the scene of the murder was ignored. That same Report confirmed that Hemme's fingerprints were not found on the antennae wire, a potentially exculpatory result given her December 10, 1980 confession to removing the wire from victim's television, to cutting the wire with a knife, and to attempting to use the wire to bind victim's hands. Because the January 29, 1981 FBI Report was never given to Hemme, her counsel did not know that Hemme's prints were not found on the antenna wire, despite her confession. Because the January 29, 1981 FBI Report was never given to the prosecutor, P.R. argued during Hemme's 1985 criminal

trial that her discussion about the antennae wire in her December 10, 1980 confession was something only the killer would know. P.R. testified at the habeas hearing that had he known about the January 29, 1981 FBI Report, he would never have made that argument and he would have insisted on securing a better palm print from M.H. as had been requested by the FBI. P.R. also testified during the habeas hearing that he was very troubled by the fact that after Hemme's 1981 guilty plea, but while her appeal following the guilty plea was pending, someone with the SJPD directed that all of the crucial crime scene evidence be destroyed, including the antennae wire with the unidentified palm print.

The April 24, 1981 FBI Report that confirmed Officer V.B. was not the source of the black hairs found on victim's bedsheets was ignored by the police. Because the Report was never given to the prosecutor, it was never made available to Hemme. P.R. argued during Hemme's 1985 trial that the jury should not be concerned that the March 4, 1981 FBI Report indicated that M.H. could not be ruled out as the source of the black head hairs found on victim's bedsheets. P.R. noted that the hairs could easily have been deposited by Officer V.B., a Black officer who was present in victim's bedroom during the crime scene investigation. P.R. testified at the habeas hearing that he did not know about the April 24, 1981 FBI Report, and that had he known about the Report, he would never have argued that Officer V.B. could have been the source of the head hairs found at the scene.

The January 30, 1981 FBI Report that found none of the many fingerprints and palm prints on the Playgirl magazine Hemme purportedly took from victim's apartment

56

belonged to victim was ignored by the police. Because the January 30, 1981 FBI Report was never given to the prosecutor, the Report was never made available to Hemme. Unaware of the January 30, 1981 FBI Report, P.R. argued during Hemme's 1985 trial that all of the items Hemme claimed to have been taken from victim's apartment, including the Playgirl magazine, the CPO jacket, the bandana, and the red gloves, were never recovered, and that Hemme must have destroyed the items because they would have connected her to the murder scene.[22] Though P.R. was not directly asked about the January 30, 1981 FBI Report, his candid response to questions about other evidence he had never before seen supports a conclusion that he would not have argued that Hemme destroyed items she claimed to have taken from victim's apartment to hide her connection to the murder had he known the items had, in fact, been recovered by the police, and analyzed, to confirm that no connection between the items and victim could be established.

The habeas record strongly suggests that the SJPD buried its investigation into M.H. as victim's potential murderer, and intentionally failed to follow up on information revealed by FBI Reports that failed to clear M.H. as a suspect in victim's murder while diminishing the reliability of details provided in Hemme's December 10, 1980 confession. There is no indication that the SJPD made any effort, for example, to conduct a forensic search of M.H.'s truck seen parked near victim's apartment on the

---

[22]As noted, *supra*, in footnote 21, P.R.'s argument was not accurate. However, the habeas record supports the conclusion that P.R. was unaware of that fact at the time of Hemme's 1985 trial. However, the inaccurate argument is nonetheless properly considered as we weigh the materiality of the suppressed *Brady* evidence.

night of the murder. There is no indication that the SJPD made any effort to interview M.H.'s friends, family, or others who could have provided information about M.H.'s whereabouts or his demeanor around the time of victim's murder. The SJPD's failure to meaningfully investigate M.H. as a suspect in victim's murder, demonstrated in part by the failure to perform these seemingly obvious investigative steps, is relevant in assessing *Brady* materiality, as we are to take into "'account . . . not only . . . the precise evidence suppressed but also . . . such additional evidence to which a skillful counsel would be led by careful investigation.'" *In re Ferguson v. Dormire*, 413 S.W.3d at 55 (quoting *State v. Thompson*, 610 S.W.2d 629, 633 (Mo. 1981)).

Adding cruel insult to this inexcusable injury, on June 8, 1981, M.H. pled guilty to insurance fraud in connection with the fraudulently reported theft of the truck parked by victim's apartment during the timeframe of her murder in exchange for the state's promise not to prosecute him for any other criminal matters for which he was under investigation. P.R. testified during the habeas hearing that M.H.'s plea agreement likely meant he could never be prosecuted for victim's murder. This plea agreement is a part of the large volume of M.H. Crime Evidence that was not disclosed to Hemme. Evidence that M.H. had been relieved of criminal responsibility for victim's murder, despite never having been cleared of the crime, would have been of the utmost value to Hemme during her trial as she sought to explain why the state would be motivated to cling to Hemme's ever evolving, contradictory, inaccurate, and unsubstantiated confession, while ignoring M.H.'s direct ties to victim's murder. Evidence that M.H. had been engaged in a pattern of home burglaries, of fraudulent use of stolen checks, and of trespass and peeping Tom

58

incidents in the months preceding and immediately following victim's murder would have been of value to Hemme during her trial as well, given the similarities between those crimes and victim's murder.

We are left with the same unmistakable impression possessed by the habeas court that the SJPD ignored and buried evidence coming into its possession that M.H. was directly tied to victim's murder. P.R. candidly testified during the habeas hearing that any evidence tying M.H. to victim's murder was important information because "the puzzle in the case was [M.H.]" SJPD Detective H.J. testified during the habeas hearing that based on M.H.'s truck having been parked by victim's apartment at the time of her murder, M.H.'s use of victim's credit card a day after her murder, the possibility that a hair found in victim's bed belonged to M.H., and M.H.'s other similar criminal activity close in time to the murder, he expected that the inculpatory information would be "walked across the street for the prosecuting attorney to review," and that he was "disgusted and angry" when that did not happen. We agree that the suppressed evidence demonstrates "a remarkably uncritical attitude" by police toward the possibility that Hemme's confession was false, and the possibility that M.H. was victim's killer. *Kyles*, 514 U.S. at 445. Whether the SJPD ignored (and suppressed) evidence to avoid the embarrassment that victim may have been murdered by one of its own officers, or the embarrassment that it had extracted a potentially false (and ever-changing) confession from Hemme just days before M.H.'s direct ties to victim's murder came to their attention may never be known. But, there is no doubt from the habeas record that the suppressed evidence was material, as in its absence, Hemme did not receive a fair trial resulting in a verdict worthy of

59

confidence. The implication of the SJPD's decision to destroy crime scene evidence, including the antenna wire, while Hemme's appeal following her guilty plea was pending is difficult to ignore under these circumstances.

We reach this conclusion notwithstanding Hemme's confession. As previously noted, the Attorney General has not claimed any irregularities with respect of the habeas court's findings that the habeas record established the gateway of manifest injustice/innocence, permitting review of Hemme's *Brady* claims, even if they were procedurally defaulted. We are thus bound by (and in any event, agree that the habeas record supports) the habeas court's conclusion that the gateway of manifest injustice/innocence was established because Hemme's "statements to police are so unreliable and that the evidence pointing to [M.H.] as the perpetrator of the crime so objective and probative that no reasonable juror would find . . . Hemme guilty."

Regardless, we can independently confirm from the habeas record that the habeas court did not exceed or abuse its authority by concluding the Hemme's December 10, 1980 confession was not reliable. That conclusion is self-evident from the statements themselves, and is supported by the credited testimony of Dr. J.E., a forensic psychiatrist.

With respect to the facial unreliability of Hemme's confession, the habeas record establishes that Detective S.F. noted after at least two of Hemme's multiple interrogations that her statements were "inconsistent with other witness statements and reports" as to times and locations. For example, it is documented that Hemme left the hospital on November 12, 1980, at approximately 1:05 p.m. She claimed in one statement she had gotten a ride from victim when she left the hospital, which was an impossibility as victim

60

was still at work, where she remained until almost 5:00 p.m. Though victim had gone to a pharmacy at 11:30 a.m. on the day of her death, she was back at work before Hemme left the hospital. During one of her statements, Hemme claimed she and victim had gone to the Skaggs pharmacy together, but victim went to Melmed Pharmacy, and again, did so ninety or more minutes before victim left the hospital. Hemme described victim's car as light blue, and then later as brown, but always with a back seat. Victim's car was a white, two-seater sports car. Hemme described victim wearing an outfit that was not at all similar to the one she was reported wearing on the day of her murder. Hemme stated on at least two occasions that she saw a white cat in victim's apartment, but victim did not own a cat and instead owned a dog. Hemme described items she claimed to have seen inside of victim's apartment that could not be verified as having ever been there, and described other items she claimed to have seen in in victim's apartment that were in explicit crime scene photographs Hemme had been shown. Hemme's fingerprints were not found on any of the items found at the crime scene, including the antennae wire found by victim's body. And, victim's fingerprints were not found on any of the items Hemme claimed she took from victim's apartment. Hemme allegedly led investigators to victim's apartment in advance of one of her statements, though victim's address and the exterior of her home had been widely disseminated by the press in advance of that crime scene visit. The habeas court credited the testimony of Detective H.J. that police "are capable of inadvertently leading a suspect to a scene while believing the suspect inadvertently directed them, as [Detective H.J.] saw firsthand in the [M.R.] investigation." Detective H.J. was referring to a late 1970's murder investigation where the SJPD arrested M.R. for

61

the murder of a child based on M.R.'s confession. That conviction was later set aside because another person confessed to the crime.[23]

Hemme claimed she discarded victim's purse in downtown Kansas City, Missouri, but M.H. claimed he found the purse almost immediately after victim's murder in a ditch as he was walking back to his truck (which was parked next to victim's home) after having allegedly been at the Woodlawn Court Motel, a claim that is the only way M.H.'s possession of victim's credit card could be explained. Hemme consistently stated that she had been dropped off by someone in Dearborn, Missouri on the day, and several hours before, victim's murder. But authorities chose to ignore that exculpatory statement, which was confirmed by the later statement of Bobby C. (a statement Detective S.F. believed) that he picked Hemme up in downtown St. Joseph on the afternoon of November 12, 1980, and dropped her off at the Dearborn exit well before the time frame of victim's murder. Hemme's accounts about who picked her up in downtown St. Joseph after she left the hospital at around 1:00 p.m. varied widely across her multiple

---

[23]The similarities between M.R.'s "false" confession and Hemme's are noteworthy. Both were a result of multiple interrogations where the interrogated suspect gave ever-changing stories. Both involved situations where conduct completely unrelated to the murder under investigation put the suspect on the SJPD's radar. Both involved highly publicized crimes, with substantial crime scene information in the public domain. Both involved convictions that were exclusively based on the suspect's confession, despite the inability to corroborate information provided by the suspect. Both involved suspects who allegedly led investigators to the scene of the murder. And, both involved convictions secured under the direction of Chief R.H. P.R. became convinced after M.R.'s conviction that M.R. was innocent and had given a false confession, and worked to see that his conviction was vacated. P.R. testified that Chief R.H. was angry and outraged at P.R.'s efforts to secure M.R.'s release. P.R. testified during the habeas hearing that he never felt comfortable with Chief R.H., and was in fact mistrustful of him, feelings that had been fueled by information gathered from SJPD detectives.

interrogations, though she ultimately claimed in her December 10, 1980 confession that victim picked her up and offered to drive her to Concordia, Missouri. Yet, the habeas record establishes victim was at work until 5:00 p.m. and had a planned meeting at 7:00 p.m. If Hemme's confession is interpreted to suggest that victim picked her up sometime after 5:00 p.m. (which Hemme never stated), it is highly suspect that victim would have agreed to drive a complete stranger to Concordia (as Hemme claimed) in the limited time she had available before her 7:00 p.m. meeting. The habeas court credited the testimony of N.B., victim's lifelong friend, that victim was very safety conscious, and would never have picked up a stranger, and would never have allowed a stranger into her home to wait while she showered. On that point, no evidence ever established that victim appeared to have just showered before she was murdered, though Hemme claimed to have attacked victim as she came out of the shower.

Though Hemme did, after multiple interrogations, provide details that were consistent with the facts of the crime and of the crime scene, all of those facts were in the public domain, or were reflected in crime scene pictures Hemme was shown, or were known to the police, who often interviewed Hemme "off the record" before capturing her statements in their notes, or (ultimately) in her sworn (final) "confession." The habeas court concluded that the record supports an inference that the police unintentionally provided Hemme with information about the crime, and that Hemme incorporated that information along with information widely disseminated in the press into her statements. Detective J.T., a retired career homicide detective and law enforcement trainer on

63

interrogation methods, testified on Hemme's behalf during the habeas hearing, and noted that the amount of information made public in victim's murder case was shocking.

The habeas court also pointed to Hemme's mental and physical condition at the time she gave her statements. The habeas court credited the testimony of Dr. J.E., a board-certified forensic psychiatrist who demonstrated her expertise in factors that increase the risk of a false confession. Dr. J.E. reviewed all of Hemme's available psychiatric records and the police records relating to her interrogation. She noted that Hemme's records reflect a history of mental illness beginning in early childhood, as she began hearing voices at age twelve. Hemme experienced delusional thinking, depression, and substance abuse, and spent the majority of her days between the ages of twelve and nineteen in psychiatric institutions. Her psychiatric records show her thoughts were described as disorganized, and that she was reported by treating clinicians as being out of touch with reality, and as experiencing auditory hallucinations and symptoms of derealization. As a child, Hemme was treated with Electroconvulsive Therapy which introduces an electrical current into the brain, inducing a grand mal seizure. This treatment was demonstrated by Hemme's records to have had a deleterious effect on her memory and cognitive function. Dr. J.E. testified that this procedure damages the prefrontal cortex, which helps regulate memory, reasoning, and other executive functions.

In the days surrounding victim's murder and Hemme's statements to police, her records reflect that Hemme sought admission to St. Joseph State Hospital seeking help for amphetamine use on November 7, 1980. On November 12, 1980, Hemme was discharged from the hospital against medical advice. She was reported to be "obviously

64

very high" according to a nurse's note.  Hemme arrived at her parents' home in Concordia, Missouri between 8:30 to 9:30 p.m., after hitchhiking over one hundred miles. Hemme was then admitted voluntarily to the hospital on November 14, 1980 and spent ten "volatile" days characterized by erratic behavior and drug use, before once again being discharged against medical advice on November 24, 1980.

On November 25, 1980, police responded to the home of a nurse after receiving an emergency call that a former patient was in her home with a knife, refusing to leave. Hemme was found hiding in the nurse's closet with a knife.  It was this incident that placed Hemme on the SJPD's radar as someone who should be interviewed about victim's murder.  Hemme was taken to the St. Joseph State Hospital where she was subjected to an involuntary 96-hour hold.  At the time of her admission, she was not communicative, had her head in her hands, and had to be forced to talk.  Prior to being questioned for the first time about victim's murder on November 28, 1980, Hemme had been in seclusion and physically restrained.  She had also been forcibly administered antipsychotic medications via injections for more than forty-eight hours as a "chemical restraint," and in an effort to "reorder thinking."  Hemme had an uncommon, serious allergic reaction to the medication and was found in her bed, eyes rolled back, with her muscles rigid and her speech slurred.  Her muscle spasm symptoms were extremely painful, and medication given to relieve the symptoms was not effective.  Her records reflect she was having a dystonic reaction as a result of the extremely painful symptoms she was experiencing, and that this was the condition she was in when she was first interviewed by Detective S.F.  Shortly before the November 28, 1980 interview, Hemme was administered Haldol

(an antipsychotic) and chloral hydrate (a hypnotic sedative). Treating nurses who were present during Heme's November 28, 1980 interview observed that she was shaking and said she felt "spacey."

Hemme's antipsychotic medication was changed on November 29, 1980, and she began receiving Navane every six hours, which continued until her discharge from the hospital on December 5, 1980, when she was charged with concealing an offense and taken to jail. Her records reflect that during this time period, Hemme continued to experience dystonic reactions, which included complaints of neck-drawing, and lying in bed with her eyes rolled back, and muscle rigidity. Dr. J.E. testified that if a patient today experiences a dystonic reaction it is treated as a medical emergency, and the medication is immediately terminated. That did not happen with Hemme. Instead, during the period between November 29, 1980, and December 5, 1980, Hemme was questioned again on December 1, 1980 (where nurses notes show that she was complaining of neck-drawing and that her speech was slurred); on December 2, 1980 (where nurses notes show that Hemme's head was "falling back" and "drawn at intervals," and sometimes "forced forwards"); and on December 3, 1980, when police removed Hemme from the hospital for several hours to take her to the crime scene and then to question her at the police station--a process that was not observed by medical personnel.

On December 5, 1980, when Hemme was charged with concealing an offense and taken to the Buchanan County jail, she was discharged from St. Joseph State Hospital with no treatment plan despite having been treated intensively for ten days with significant psychiatric intervention. Hemme's discharging physician concluded that

66

Hemme was not suffering any mental illness, a conclusion Dr. J.E. testified was "shocking," and at odds with the records which demonstrated a patient in clear psychiatric crisis. Detective. S.F. questioned Hemme again on December 9, 1980, at which time he reported to her that Joe W. could not have murdered victim. His notes reflect that Hemme was visibly upset, that she was "clenching and unclenching her fist and moving about in her chair," that she was speaking in equivocal, dissociated language, and that she stated she did not really know if she had killed victim or not. It was at the conclusion of this interview that Detective S.F. noted that did not believe further interviews of Hemme would be productive in getting at the truth. Yet, Hemme was interviewed again the following day, without Detective S.F.'s participation. After an undocumented amount of time spent with SJPD officers and investigators, Hemme gave the transcribed December 10, 1980 confession referred to by the state during at her 1985 trial as "the truth."

Dr. J.E. opined that Hemme was highly vulnerable to make false statements; that she was interrogated as an adolescent whose thoughts were being chemically controlled and while she was in acute pain; that she was sleep-deprived and in active withdrawal from drug use; that she did not trust her own memory; and that her psychiatric condition positioned her both to seek and try to hold attention by any means necessary. Dr. J.E. opined that Hemme had a history of traumatic life events associated with increased levels of suggestibility, compliance with police investigators, and ultimate false confessions because trauma significantly reduces the ability to withstand interrogative pressure. Dr.

67

J.E. opined that Hemme's psychiatric condition likely caused her to "prioritize short-terms goals such as ending acute distress rather than weighing long-term consequences."

The habeas court credited Dr. J.E.'s testimony as reliable and found "when considering the factually inconsistent content of . . . Hemme's statements in combination with her malleable mental state when questioned, that the evidence in totality supports a conclusion that her statements connecting herself to [victim's] murder were unreliable and, in many instances, untrue."  The habeas court noted that people with borderline personality like Hemme have "poor self-concept" and distrust the reliability of their own memories and are more likely to believe, when they are presented with crimes by interrogators, that they must have committed the crime even when they do not recall having done so, such that they start to fill in information.  The habeas court noted that its conclusion was substantiated by the habeas hearing testimony of L.H., who successfully represented Hemme in the effort to withdraw her guilty plea based on ineffective assistance of counsel.  L.H. testified that when he began interviewing Hemme in 1981, she was confused, malleable, and would say and repeat just about anything suggested to her.

Ultimately, the habeas court found that "the evidence as a whole establishes that . . . Hemme's statements inculpating herself are inconsistent, contradicted by physical evidence and accounts of reliable, independent witnesses, and that . . . Hemme's impaired psychiatric condition when questioned substantially undermined the reliability of those statements as evidence of guilt."  The habeas court also found that "no evidence

68

whatsoever outside of . . . Hemme's unreliable statements connect[] her to the crime," and that in contrast, "the evidence directly ties [M.H.] to this crime and murder scene."

The habeas court's findings support the habeas court's legal conclusion that Hemme established the gateway of manifest injustice/innocence sufficient to permit review of her *Brady* claims, even without regard to whether the Attorney General waived the defense that the claims were procedurally barred. The Attorney General has not, as we have noted, challenged the habeas court's legal conclusion about the gateway of manifest injustice/innocence. Importantly, in the context of assessing *Brady* materiality, "the cumulative *Brady* evidence alters the calculus on [Hemme's] confession," and "bolster[s] [Hemme's] claims that [her] confession was involuntary" due to her psychiatric circumstances. *Wright v. State*, 91 A.3d 972, 993 (Del. 2014).

The habeas court did not commit error when it concluded that the suppressed evidence it identified was material, and that as a result, Hemme established *Brady* violations supporting habeas relief. The Attorney General's Points Six, Seven, Nine (relating to materiality), Eleven, and Thirteen (relating to materiality) are without merit and are denied.

## IV.

### *The Habeas Record Supports the Issuance of a Writ of Habeas Corpus*

For the reasons explained, we refuse to quash the habeas record insofar as it grants Hemme habeas relief based on the five identified *Brady* violations. We need not address, therefore, the additional bases for affording habeas relief found by the habeas court, including the finding that the habeas record supports Hemme's freestanding actual

69

innocence claim, and Hemme's claims of ineffective assistance of counsel. Even if we were to address those bases for habeas relief, the outcome would be the same, as all bases for affording habeas relief yield an identical result--the vacation of a prior conviction, the restoration of the relator to the status of a pretrial detainee, and the state's opportunity to retry the habeas relator subject to conditions as may be imposed by the habeas court or by this court following certiorari review. *State ex rel. Koster v. McElwain*, 340 S.W.3d at 232.

Because we need not address the alternative bases for affording habeas relief, we neither quash or refuse to quash the habeas record with respect to Hemme's claim of freestanding actual innocence, and her two claims of ineffective assistance of counsel. The Attorney General's claimed irregularities relating to these alternative bases for habeas relief, Points One, Two, Three, Four, and Five, are therefore denied as moot.

## Conclusion

The habeas court did not exceed or abuse its authority in concluding that Hemme established the gateway of cause and prejudice and the gateway of manifest injustice/innocence permitting the habeas court to review Hemme's *Brady* claims. The habeas court did not exceed or abuse its authority in concluding that Hemme established *Brady* violations in connection with the Earring Evidence, the three suppressed FBI Reports, and the M.H. Crime Evidence. As a result, the habeas court did not exceed or abuse its authority in concluding that Hemme established a violation of her due process right to a fair trial, warranting the issuance of a writ of habeas corpus.

70

We therefore refuse to quash the record of the habeas court. Hemme's 1985 conviction of capital murder in Buchanan County, Missouri in Case Number CR380-35F is vacated. The effect of habeas relief is to return Hemme to the status of a charged pretrial detainee. *Irvin v. Dowd*, 366 U.S. 717, 728 (1961). Based on the habeas court's Judgment, Hemme has already been released on pretrial conditions set by the habeas court pursuant to Rule 91.14 and Rule 33.

We are authorized to "impose restrictions on the retrial of a defendant whose conviction has been vacated by a writ of habeas corpus." *State ex rel. Koster v. McElwain*, 340 S.W.3d at 258 (citing *State ex rel. Amrine v. Roper*, 102 S.W.3d at 544, 549; *State ex rel. Engel v. Dormire*, 304 S.W.3d at 130). Hemme shall be released from the pretrial conditions set by the habeas court, and from the jurisdiction of the Buchanan County Circuit Court over the offense for which Hemme was convicted in Case Number CR380-35F, *unless* the state files a written election to retry Hemme in relation to the offense within ten days from the date of the issuance of our mandate, *and unless* the state thereafter commences to retry Hemme within 180 days of the date of its filed election (with the trial date being subject only to extensions requested or consented to by Hemme).

_____
Cynthia L. Martin, Presiding Judge

All concur

71